RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0126p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

> No. 23-5394

*v.*

JOHN L. STANTON, M.D.,

*Defendant-Appellant*.

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:21-cr-00019-4—Robert E. Wier, District Judge.

Argued:  May 28, 2024

Decided and Filed:  June 5, 2024

Before:  SUTTON, Chief Judge; CLAY and BUSH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Appellant.  Allaya Lloyd, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Ronald W. Chapman, II, CHAPMAN LAW GROUP, Troy, Michigan, for Appellant.  Allaya Lloyd, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Andrew E. Smith, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

─────────────

## OPINION

─────────────

SUTTON, Chief Judge.  Dr. John Stanton served as the medical director for a pain clinic in northern Tennessee.  The federal government alleged that the clinic operated as a pill mill and charged Dr. Stanton with conspiring to violate federal drug laws.  After a seven-day trial, a jury

convicted him. On appeal, Dr. Stanton challenges the sufficiency of the evidence to support the jury's verdict and several rulings by the trial court. We affirm.

I.

In 2000, Dr. James Maccarone opened Gateway Medical Associates as a primary care medical practice in Clarksville, Tennessee. After a dozen years in operation, Gateway began to serve more patients seeking treatment for pain management. Over time, Dr. Maccarone came to realize that his clinic had gained a "reputation" as a "pill mill" where patients could "walk in, . . . pay whatever it is that it costs, and . . . walk out with narcotics." R.307 at 190. Patients drove as long as five hours each way to reach the clinic, drove by several other pain management clinics along the way, then waited in the parking lot past midnight to be seen, all while claiming (in many cases) to suffer from back pain. Drug dealers "sponsored" many of these patients so they could obtain prescription narcotics. R.306 at 270.

"[D]rowning in debt" and recognizing that he could charge more than twice as much for a pain visit as he did for primary care, Dr. Maccarone leaned into the clinic's growing reputation as a "pill mill." R.307 at 218. Disregarding medical standards, Dr. Maccarone prescribed opioids even after patients failed drug tests, and on the rare occasions when he discharged patients for testing positive, he would allow them back into the practice if they paid an extra fee.

In July 2016, Tennessee began requiring pain management clinics to employ medical directors. *See* Tenn. Code § 63-1-306(a). Dr. Maccarone lacked the credentials to qualify for this position. But he knew Dr. Stanton. Stanton practiced orthopedic surgery at the facility next door and had received certification in pain management. Dr. Stanton already served as the medical director for another clinic, and he agreed to serve this role at Gateway as well in return for a salary of $1,500 per week.

As Gateway's medical director, Dr. Stanton oversaw its pain management services and safeguards, including state mandated policies for urine screening and pill counts. Dr. Stanton eventually warned Dr. Maccarone that Gateway's unusual hours, long-distance patient population, and high levels of medication raised "red flags." R.307 at 226, 228.

But Dr. Maccarone ignored Dr. Stanton's recommendations to taper off high narcotics doses, and Dr. Stanton continued to sign off on state compliance reports despite his concerns.

When Dr. Maccarone took an emergency medical leave of absence in November 2018, Dr. Stanton assumed responsibility for his patients. Dr. Stanton would see as many as three dozen patients in a single afternoon. He maintained Dr. Maccarone's practice of prescribing narcotics to patients who failed drug screens. But he did reduce these prescriptions by a standard amount of five or ten pills when patients refused his advice to try injections or physical therapy as alternatives. After Dr. Maccarone returned to the practice, Dr. Stanton continued to see his patients. Between November 2018 and October 2020, Dr. Stanton wrote roughly 5,800 narcotics prescriptions, and Dr. Maccarone wrote about 9,000 prescriptions.

Gateway's prescription practices, together with large numbers of patients "tailgating" in the parking lot for hours, led state and federal investigators to scrutinize the clinic. R.305 at 103. After conducting a warrant-authorized search of Gateway, the government indicted Dr. Stanton, Dr. Maccarone, and two patient sponsors, Jeffrey Ghent and Terry Prince, for conspiring to distribute controlled substances without a legitimate medical purpose. Dr. Maccarone and the sponsors pleaded guilty. Dr. Stanton went to trial.

Over the course of seven days, the jury heard from nineteen government witnesses, including Dr. Maccarone, the sponsors, and several clinic patients, as well as from Dr. Stanton and two other defense witnesses. The government also planned to offer expert testimony that Dr. Stanton's prescription practices lacked a legitimate medical basis. On the second day of trial, it asked the court to substitute a new expert witness, Dr. Timothy King, after it had second thoughts about its existing expert. The trial court held that this late disclosure would prejudice Dr. Stanton. But the court did allow Dr. King to testify as a rebuttal witness solely in response to Dr. Stanton's own testimony.

The jury found Dr. Stanton guilty of the drug conspiracy charge. At sentencing, the court concluded that the files for 21 patients introduced at trial showed Dr. Stanton had prescribed a converted drug weight of at least 21,524 kilograms. On that basis, the Sentencing Guidelines

recommended a minimum sentence of 188 months.  The trial court varied downward to 120 months.

II.

On appeal, Dr. Stanton challenges his conviction and sentence in five ways: (1) insufficient evidence to convict him for conspiracy; (2) reversible error in allowing Dr. King to testify on rebuttal; (3) abuse of discretion in instructing the jury on deliberate ignorance; (4) reversible error in responding to the jury's questions about the jury instructions; and (5) insufficient evidence to support the drug weight calculation at sentencing.

*Sufficiency of the evidence*.  In reviewing this challenge, we make all reasonable inferences from the testimony and trial record in favor of the jury verdict.  *United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023) (per curiam).  We will reverse only if no "trier of fact" could have found that the government proved the elements of this crime beyond a reasonable doubt.  *Id.*

To prove its case, the government had to establish that two or more people agreed to violate federal drug laws and that Dr. Stanton knowingly and voluntarily participated in the agreement.  *See United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021).  The government may establish these elements of the crime through circumstantial evidence, including knowledge of unusual prescribing practices or knowledge of unusual patient protocols.  *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015); *see United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016).

The evidence sufficed to make this finding.  The jury heard considerable evidence from Dr. Maccarone and other witnesses that Gateway operated as a pill mill and violated federal law in doing so.  The question before the jury thus was not whether a drug conspiracy existed; it was whether Dr. Stanton agreed to join it.  Ample evidence showed that Dr. Stanton agreed to join the conspiracy.

Dr. Stanton agreed to help Dr. Maccarone operate Gateway by serving as its medical director.  He saw plenty of red flags that Gateway operated as a pill mill and declined to cure

them: the long and unusual clinic hours; patients traveling long distances from out of state; high narcotics dosages without individualization or tapering; and continued prescriptions to patients who failed drug screens. *See United States v. Lang*, 717 F. App'x 523, 544 (6th Cir. 2017) (affirming a clinic owner's conviction for drug conspiracy when "it was clear to even casual observers that [the clinic] was a pill mill"). Even after seeing these red flags, he continued to sign off on compliance reports, and he continued to see the high-dosage patients whose prescriptions Dr. Maccarone refused to lower.

The jury also could have found that Dr. Stanton's prescriptions furthered the conspiracy. He spent only a few minutes with each of his own patients before signing off on pre-printed prescriptions. His medical assistant testified that neither doctor used the clinic's electronic medical records, and a pharmacy expert testified that Dr. Stanton's prescriptions lacked the dosage individualization of legitimate pain management practices. Even after Dr. Maccarone returned to Gateway, Dr. Stanton continued to see patients and wrote almost 40% of Gateway's prescriptions between November 2018 and October 2020.

The jury also could have found that Dr. Stanton's unconvincing efforts to clear his name with investigators amounted to an effort to cover up his participation in the drug conspiracy. Dr. Stanton, for instance, told an investigator from the Drug Enforcement Agency that Gateway discharged patients who tested positive for heroin and cocaine, even though Gateway's records showed otherwise. *Cf. United States v. Gardiner*, 463 F.3d 445, 462–63 (6th Cir. 2006) (distinguishing acts of concealment that further an ongoing conspiracy from those that cover up previous crimes).

Dr. Stanton replies that the government failed to prove that he wrote any prescriptions at Gateway without proper medical authorization. But that proof would have mattered only if the government had charged Dr. Stanton with distributing controlled substances under 21 U.S.C. § 841(a). *See Ruan v. United States*, 597 U.S. 450, 457 (2022). It did not. It instead charged him with conspiring to distribute drugs, 21 U.S.C. § 846, a crime that targets the agreement to commit the unlawful act and a crime that does not turn on whether any one conspirator completed the underlying substantive crime. *Wheat*, 988 F.3d at 306. The government proved

its case by showing that Dr. Stanton knowingly agreed to help Gateway and Dr. Maccarone illegally distribute controlled substances.

Dr. Stanton points out that the jury heard evidence that he never knowingly agreed with any other conspirator to dispense narcotics. For instance: Dr. Maccarone testified that he never spoke with Dr. Stanton about operating Gateway as a pill mill; Ghent testified that Dr. Stanton evaluated his shoulder and recommended surgery before prescribing narcotics; and Prince testified he never spoke with Dr. Stanton at all. But the jury could reasonably credit Dr. Maccarone's testimony that he hired Dr. Stanton with the "mutual understanding of what [Dr. Maccarone] was doing and of what [Dr. Stanton] was doing." R.307 at 247. It could view Dr. Stanton's examination of Ghent as pretextual and, even if not, as one that still involved a pre-printed prescription, as with many other patients. And it makes no difference that he did not speak to *one* of the sponsors. Once the jury heard testimony from Dr. Maccarone and other witnesses defining the scope of the conspiracy and providing circumstantial evidence of the conspiracy, it needed only to find a connection between that crime and Dr. Stanton as well as an agreement to join the conspiracy. Ample evidence supported the jury's finding on this score. *See United States v. Sadler*, 24 F.4th 515, 542 (6th Cir. 2022).

Dr. Stanton insists that the government may not bootstrap his regulatory violations as Gateway's medical director into criminal liability. But the government did not charge Dr. Stanton with conspiracy to violate Tennessee's clinical guidance. It charged him with conspiring to violate federal drug laws. Because the government may use circumstantial evidence to support that charge, it was fair game to introduce evidence that Dr. Stanton failed to follow Tennessee's regulatory requirements, as this evidence supported the theory that he knowingly joined an illegal scheme. *See United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023) (inferring knowledge of illegal prescriptions from evidence that provider practices violated clinic policies and exceeded state and federal dosage guidance); *cf. United States v. Brown*, 553 F.3d 768, 791 (5th Cir. 2008) (acknowledging "the irreproachable, commonplace use of duly issued regulations in clarifying the scope and contour of criminal laws" against drug conspiracy). The government, moreover, informed Dr. Stanton that it would reference these Tennessee rules prior to trial, and he never objected to this evidence when prompted by the court. Nor did

Dr. Stanton object at trial when a Tennessee official testified about these rules, or when the government introduced copies of the regulations seized from Gateway. Sufficient evidence, all in all, supported the conviction.

*Expert testimony.* Dr. Stanton separately challenges the district court's decision to permit Dr. King to testify as an expert witness on rebuttal. Abuse-of-discretion review applies to a trial court's "control [over] the scope of rebuttal testimony." *Geders v. United States*, 425 U.S. 80, 86 (1976).

A party may offer rebuttal testimony to counter evidence offered by the defense. And that is true even when the party, the government in this instance, could have anticipated the defense and offered the same evidence as part of its case in chief. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 345 (6th Cir. 2002); *Martin v. Weaver*, 666 F.2d 1013, 1020 (6th Cir. 1981).

The court did not abuse its discretion in handling Dr. King's rebuttal testimony. After Dr. Stanton testified that he had used his best medical judgment in working at Gateway, the government called Dr. King to evaluate that testimony. Dr. King explained that it fell "outside the standard of care" to schedule as many patients in as short of a time as Dr. Stanton did, to continue to prescribe narcotics to patients who failed drug screens, and to treat another doctor's patients without "an independent medical evaluation." R.309 at 288–91. In each instance, this testimony rebutted Dr. Stanton's testimony about the relevant medical standards, and in each instance it impeached his credibility on these fronts. *See United States v. Hofstetter*, 31 F.4th 396, 428 (6th Cir. 2022), *vacated on other grounds by* 143 S. Ct. 351 (2022). Although Dr. Stanton's evidence was not "new" in the sense that the government understood Dr. Stanton likely would raise this defense, Dr. King's testimony qualifies as fair-game rebuttal evidence because it challenged defenses that entered the trial through Dr. Stanton's testimony. *See Benedict v. United States*, 822 F.2d 1426, 1428–30 (6th Cir. 1987).

Dr. Stanton replies that Dr. King's rebuttal testimony unfairly surprised him after the government withdrew its original expert. But Dr. King did not come out of nowhere. The government identified him as a potential expert witness when the original expert could not testify. Nor did Dr. Stanton request a continuance in the face of this late disclosure.

The government, at any rate, did not have an obligation to anticipate how Dr. Stanton would defend himself when it crafted its own case in chief. *Hofstetter*, 31 F.4th at 428. In response to that testimony, Judge Weir carefully cabined Dr. King's testimony to ensure that it responded only to Dr. Stanton's own testimony. No abuse of discretion occurred.

*Jury instruction*. Dr. Stanton challenges the district court's deliberate-ignorance instruction. We review the instruction for an abuse of discretion and will reverse only if the instructions as a whole prove confusing, misleading, or prejudicial. *United States v. Frei*, 995 F.3d 561, 565 (6th Cir. 2021).

A deliberate-ignorance instruction prevents a defendant from avoiding the consequences of his actions by closing his eyes to the obvious. *United States v. Mitchell*, 681 F.3d 867, 876 (6th Cir. 2012); *United States v. Geisen*, 612 F.3d 471, 485–86 (6th Cir. 2010). In pill-mill conspiracies, the instruction prevents clinic owners and providers from claiming a lack of knowledge of illegal operations despite awareness of serial red flags. *See, e.g.*, *United States v. Ashrafkhan*, 821 F. App'x 428, 435 (6th Cir. 2020); *United States v. Gowder*, 841 F. App'x 770, 783 (6th Cir. 2020); *United States v. Leman*, 574 F. App'x 699, 705–06 (6th Cir. 2014). To prevent juries from confusing the high standard of willful blindness with mere "negligence, carelessness[,] or ignorance," trial courts should provide this instruction only when the record could support this inference and the defendant claims a lack of knowledge. *Mitchell*, 681 F.3d at 876.

The court's instruction fits that standard. The jury heard copious evidence suggesting that Dr. Stanton knew about Gateway's unusual patient population, Dr. Maccarone's lack of concern about drug testing, and other telltale signs of a pill mill. To all of this, Dr. Stanton claimed a lack of knowledge about any criminal conduct at Gateway. The jury could permissibly find from that evidence that Dr. Stanton deliberately avoided learning of Gateway's illicit practices. *Cf. Leman*, 574 F. App'x at 706 (observing that evidence of a "large percentage of patients . . . [who] drove for hours in large groups" and received "very high dosages of narcotics" supported giving deliberate ignorance instruction).

Dr. Stanton replies that the instruction fails to follow *Ruan*, which held that the government must prove that a doctor knowingly acted outside the authorized practice of medicine to violate 21 U.S.C. § 841(a).  597 U.S. at 459–60.  But *Ruan* does not prevent the government from proving knowledge "through circumstantial evidence."  *Id.* at 467.  A deliberate ignorance instruction satisfies *Ruan* when, as here, it reminds the jury that this standard sits well above carelessness, negligence, and mistake.  *Anderson*, 67 F.4th at 766; *see also United States v. Hofstetter*, 80 F.4th 725, 731 (6th Cir. 2023).  Nor did the court impermissibly allow the jury to use deliberate ignorance to infer Dr. Stanton's intent to join the conspiracy.  *See United States v. Matthews*, 31 F.4th 436, 450 (6th Cir. 2022).  It instead instructed the jury that it could infer Dr. Stanton's knowledge of the conspiracy's aims based on what he did, how he acted, the natural results of his conduct, and other circumstantial evidence.

*Jury questions*.  Dr. Stanton argues that the trial court erred in its response to the jury's questions during deliberations.  But the government, Dr. Stanton, and the court all agreed to do what the court did:  refer the jury to the instructions as already given.  Dr. Stanton's counsel informed the court that the supplemental instructions appeared "fine" to him.  R.310 at 123. That agreement to the form of the instruction waives our review of this issue.  *See United States v. Daneshvar*, 925 F.3d 766, 786–87 (6th Cir. 2019).

Even if we reviewed the supplemental instruction for plain error, as Dr. Stanton requests, no such mistake occurred in referring the jury to legally correct statements of the law.  *See United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994).  The existing conspiracy instruction, which followed the contours of the Sixth Circuit Pattern Jury Instructions, fully covered the legal questions the jury raised.  *See United States v. Hines*, 398 F.3d 713, 718–19 (6th Cir. 2005) (affirming jury instructions that "essentially tracked the language and organization of the Sixth Circuit Pattern Jury Instruction regarding conspiracy").  Dr. Stanton replies that the jury expressed confusion about the elements of conspiracy, but the supplemental instruction clarified that the jury must find "both" previously listed elements satisfied.  R.239 at 8.

*Sentencing*.  Dr. Stanton argues that the government failed to prove the converted drug weight used to sentence him by a preponderance of the evidence.  The sentencing guideline for a criminal drug conspiracy instructs the trial court to calculate a base offense level based on the

"converted drug weight" of the illegal prescriptions. *See* U.S.S.G. § 2D1.1(a)(5), (c). The calculation may include illegal prescriptions that the defendant personally wrote as well as those attributable to his role in "jointly undertaken criminal activity," *id.* § 1B1.3(a)(1)(B), including the prescriptions Dr. Maccarone wrote as a reasonably foreseeable result of Dr. Stanton's participation in the conspiracy, *see United States v. Sadler*, 750 F.3d 585, 594 (6th Cir. 2014). The court should "show its work" to explain why a preponderance of the evidence supports that reasonable and conservative estimate of the amount of drugs involved. *United States v. Woodside*, 895 F.3d 894, 900–02 (6th Cir. 2018).

The trial court did just that in finding that Dr. Stanton illegally prescribed narcotics to these 21 patients. It recognized that the government had introduced evidence of numerous irregularities in the patient files, including failed drug tests and pill counts, brief patient visits, and standardized dosages. Evidence at trial, including Dr. Maccarone's testimony, explained that these and other activities violated Gateway's own written policies, Tennessee's state regulations, and standard medical practices.

In the alternative, the court reasoned that the identified prescriptions conservatively and reasonably accounted for the total number of prescriptions that Dr. Stanton enabled at Gateway. The court explained that Gateway's "whole operation is highly tainted" and that the 21 patients surely undercounted the total amount of illicit prescriptions at Gateway. R.358 at 216. It recognized that Dr. Maccarone could not have operated Gateway "without Dr. Stanton's blessing" as medical director, and it attributed Dr. Maccarone's prescriptions to Dr. Stanton. *Id.* at 221. The court properly reasoned that these 21 patients represented only about 4% of the clinic's clientele, 6% of its long-distance travelers, and an unknown number of sponsored patients. The evidence at trial further showed that Dr. Stanton personally wrote about 40% of Gateway's prescriptions in the two years following Dr. Maccarone's medical absence. One way or another, no abuse of discretion occurred. *Cf. Woodside*, 895 F.3d at 901–03.

Dr. Stanton objects that the government did not introduce expert testimony that the prescriptions for these 21 patients were improper and thus could not prove that he knew that he wrote these prescriptions outside the authorized practice of medicine. Although expert testimony would have been useful, the trial record presents a far cry from the situation that Dr. Stanton

posits, in which the government fails to introduce any evidence, expert or otherwise, to show that a physician's careful treatment of patients violated accepted medical standards. On this record, the district court could readily find that Dr. Stanton knowingly turned a blind eye to the many red flags surrounding his and Dr. Maccarone's drug-prescription habits and should be sentenced accordingly.

We affirm.