NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0117n.06

No. 24-3246

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Feb 28, 2025

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| BERNARD OPPONG, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| UNITED STATES OF AMERICA, | ) | |
| Respondent-Appellee. | ) | |
| | ) | OPINION |
| | ) | |
| | ) | |

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner Bernard Oppong appeals the district court's judgment denying his motion to vacate sentence pursuant to 28 U.S.C. § 2255. The district court granted a certificate of appealability on the sole question of whether the government presented sufficient evidence of subjective intent to support Oppong's drug-related convictions. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual Background

Petitioner Bernard Oppong worked as a medical doctor at Health and Wellness Medical Center, LLC ("HWMC"), an opioid treatment facility owned by pharmacists Darrell Bryant and Gifty Kusi, who also operated Health and Wellness Pharmacy, LLC ("HWP"). During Dr. Oppong's time working for Bryant and Kusi, he became involved in two primary types of illegal

conduct by HWMC and HWP. One concerned the sale of compounded creams, and the other concerned the unauthorized prescribing of Suboxone, a Schedule III controlled substance.

### 1. Compound Cream Prescriptions

Pharmacists Bryant and Kusi worked to manufacture and sell compound creams out of the HWP business with the help of HWP physicians and employees. HWP physicians, including Dr. Oppong, prescribed the creams to some patients without a physical examination. The creams were then shipped directly to patients, allowing for multiple refills. Recipients of the creams included patients of Clinic 5, an opioid treatment center, as well as shoppers of Sav-a-Lot grocery store, where HWP operated a small location resembling "a little storeroom" that was almost "like a closet." *See* Trial Tr., R. 37, Page ID #479–81. Inside the Save-a-Lot store, non-physician employees of HWP would confront grocery shoppers and ask them questions about their health, particularly with respect to any skin or pain problems, with the goal of selling the creams. No physical examinations were performed on these shoppers. Later, pharmacist Bryant would pick up the questionnaires completed by shoppers.

In addition to the Clinic 5 patients and Sav-a-Lot shoppers, HWP solicited other purchasers for the creams by sending a non-physician employee to canvass neighborhoods door-to-door and conduct mobile visits by van. One such employee, Jamie Snyder, resigned from her role as a nurse practitioner after being asked to sign stacks of cream prescriptions prepared by pharmacist Kusi. Meanwhile, Dr. Oppong and another physician, Dr. Rivera, acquiesced to signing the prescriptions. Both doctors prescribed compound creams for patients they had not met. Dr. Oppong prescribed no less than $589,000 worth of creams compounded by HWP.

Most of these cream prescriptions went to participants in the Medicaid-based health plan, CareSource. For certain medications, such as compounded creams, CareSource used a prior

authorization system to certify proper use. At the time of these events, the threshold amount requiring prior authorization at CareSource was $300; however, since most of HWP's cream prescriptions were billed for less than that amount, they went unchallenged. As a result of Dr. Oppong's signing prescriptions for patients he had not examined, claims were submitted to Medicaid representing that the creams were medically necessary. Several patients received the compound creams prescribed by Dr. Oppong without ever meeting him. Because of HWP's unusually high volume of cream prescriptions, CareSource eventually contacted the Ohio Board of Pharmacy regarding their legitimacy. Dr. Rivera, who had initially prescribed the creams alongside Dr. Oppong, became concerned about signing the prescriptions for patients without first examining them, and contacted the Board for advice. In July 2015, search warrants were executed at multiple HWP and HWMC locations by the Board of Pharmacy, Medicaid Fraud Control Unit, Attorney General's Office, the DEA, the FBI, and the Dublin Police.

### 2. Suboxone Prescriptions

In February 2015, HWMC's decision to begin accepting insurance and Medicaid caused their patient population to increase significantly. The clinic atmosphere grew crowded and disorganized, turning into "a madhouse." Trial Tr., R. 38, Page ID #881. Patients were required to participate in counseling to get their prescriptions, but these counseling sessions were overcrowded and only loosely enforced. *See* Trial Tr., R. 39, Page ID #960 (noting that one patient described counseling as "a joke," with a counselor saying, "if you want to take a nap, you can take a nap"). Accompanying this disorder within the clinic, owners and pharmacists Bryant and Kusi instructed Dr. Oppong to pre-sign prescriptions of Suboxone.

Suboxone is a Schedule III controlled substance used to treat opioid-use disorder. It has a street value and is often sought by individuals trying to self-medicate or sustain themselves until

they can obtain a more potent drug to "get high." Trial Tr., R. 38, Page ID #763. Accordingly, physicians are bound to certain guidelines when prescribing the drug to avoid the risk of diversion. Dr. Oppong was registered with state and federal authorities to prescribe controlled substances and had a special registration, known as a data waiver, which permitted him to prescribe Suboxone to a small number of patients each month. The applicable regulations required that the prescriptions be dated and signed on the date issued. Despite this, Dr. Oppong and other HWMC physicians with data waivers pre-signed the prescriptions of Suboxone without dating them or completing the dosing information. These prescriptions would be placed in patient's charts and distributed at various times when the prescribing physician was not present. Any incomplete information on the prescriptions, such as the name, date, dispense number, or date of birth, would be completed by a non-physician employee at check-out.

This practice of placing pre-signed prescriptions in patient charts allowed HWMC to process patients more quickly and bill for additional services. On some occasions, the patients would be seen by another doctor on the date of the prescription being signed, but other times they did not see any doctor and "just got the prescription regardless." Trial Tr., R. 39, Page ID #907. Dr. Oppong also signed progress notes for patients who had only been examined by Bryant, a non-physician. On one occasion, Dr. Oppong "had somewhere to be," so he "signed a bunch of the patient's charts and then a bunch of blank prescriptions so that way all the patients had prescriptions for the day." Trial Tr., R. 39, Page ID #919; *see also* R. 39 at Page ID #972 (observing that the medical clinic "had a stack of prescriptions that sometimes were already signed and filled out").

Managed care organizations can deny pre-authorization for Suboxone refills if the applicable drug screens are out-of-date or non-compliant. Certain physicians at HWMC, such as

Dr. DeMint and Dr. Hatfield, refused to pre-sign incomplete prescriptions for Suboxone due to the legal consequences and risks, such as diversion, inherent to the drug. Additionally, unlike Dr. Oppong, they refused to sign off on progress notes for patients they had not examined. In September 2016, the government executed another search warrant at HWMC.

## B. Procedural History

### 1. Indictment and Trial Proceedings

In 2018, Dr. Bernard Oppong was charged with conspiracy to commit healthcare fraud under 18 U.S.C. § 1349 (count 1), healthcare fraud under 18 U.S.C. § 1347 (count 2), making false health care statements under 18 U.S.C. § 1035 (counts 3-6), and conspiracy to illegally distribute controlled substances under 21 U.S.C. § 846 (count 7).

At trial, witnesses testified that Dr. Oppong pre-signed stacks of Suboxone prescriptions days in advance of their distribution to patients. This testimony was corroborated by an analysis of the prescription and scheduling data, which confirmed Dr. Oppong issued prescriptions to patients on days when he had not seen them. Several patients testified to having received compound creams from HWP or Suboxone from HWMC. The jury saw multiple Suboxone prescriptions with Dr. Oppong's signature, but without dates or dosing information, that had been seized during execution of the search warrant at HWMC. Two doctors—Jornel Rivera and Mark Hatfield—also testified that pre-signing Suboxone prescriptions without dates or dosing information was unlawful and had no "legitimate medical purpose." *See* Trial Tr., R. 38, Page ID #671–75, 798. At the close of the prosecution's case-in-chief, the defense made a motion for judgment of acquittal under Rule 29, which the district court denied.

In May 2019, a jury convicted Oppong of health care fraud regarding the compound creams, making false health care statements regarding the compound creams, and conspiracy to

illegally distribute controlled substances regarding the Suboxone, which totaled five out of the seven charged counts, and acquitted him of the remaining charges. The defense reiterated the Rule 29 motion for purposes of the record, which the district court again denied. The court sentenced Oppong to twelve months and one day of imprisonment, followed by two years of supervised release.

### 2. Post-Trial Motions and Direct Appeal

Dr. Oppong filed a motion for a new trial on the basis that trial counsel had been ineffective by not having him testify. He submitted a declaration that had he testified, he could have "explained [his] thinking in respect to the signing of blank prescriptions." Def.'s Second Br. in Supp. of Req. for New Trial, R. 47-2, Page ID #1416. The district court denied the motion, finding that Oppong had not satisfied his burden under Rule 33. Further, the district court concluded that even had Oppong's attorney performed deficiently, there was no reasonable probability that the outcome of the trial would have been different.

Oppong appealed the district court's denial of his motion for a new trial based on ineffective assistance of counsel. He moved for this Court to hold his appeal in abeyance pending the Supreme Court's ruling in *United States v. Ruan*. 597 U.S. 450 (2022). This Court denied the motion and affirmed Oppong's convictions. *See United States v. Oppong*, No. 21-3003, 2022 WL 1055915 (6th Cir. April 8, 2022).

### 3. § 2255 Proceedings

In January 2023, Oppong filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255. The district court denied the motion. *See Oppong v. United States*, No. 2:18-CR-0228, 2024 WL 474395, at *1 (S.D. Ohio Feb. 7, 2024). The court interpreted Oppong's motion as arguing that "(1) the jury instructions at his trial were erroneous because they did not convey *Ruan*'s subjective

standard to the jury; and (2) the Government did not present sufficient evidence of a culpable state of mind to support his convictions." Op., R. 104, at Page ID #1907. The court concluded that the jury instructions were unaffected by *Ruan* because, regardless of the question of *Ruan*'s applicability to any specific charge, the instructions for all charges had conveyed an adequate mens rea standard to the jury.

The district court also held that there was sufficient evidence of Oppong's subjective intent at trial. Particularly, the court noted the availability of circumstantial evidence to prove knowledge and reasoned that:

> [T]he subjective belief that Dr. Oppong purports to have held—that he was authorized to leave blank, signed prescriptions for others to fill out as needed—is so unreasonable, when measured against objective criteria, that the Government carried its burden with respect to knowledge, even absent direct evidence of Dr. Oppong's intent.

*Id.* at Page ID #1915.

Dr. Oppong proceeded to file a motion for a certificate of appealability on the issue of sufficiency of the evidence. The district court granted the motion and issued a certificate of appealability with respect to "whether the Government presented sufficient evidence of subjective intent to support [Oppong's] convictions under 18 U.S.C. § 1347, 18 U.S.C. § 1035, and 21 U.S.C. § 846." Op., R. 115, Page ID #1962. On March 22, 2024, Oppong appealed the district court's denial of his § 2255 motion to vacate due to insufficiency of the evidence.

## II. DISCUSSION

### A. Preservation and Standard of Review

We review a district court's denial of a § 2255 motion *de novo*, although factual findings are reviewed for clear error. *See Huff v. United States*, 734 F.3d 600, 605 (6th Cir. 2013). "To prevail under 28 U.S.C. § 2255, a defendant must show a 'fundamental defect' in the proceedings

which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Gall v. United States*, 21 F.3d 107, 109 (6th Cir. 1994) (citing *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)). Challenges to the sufficiency of the evidence are also reviewed *de novo*. *United States v. Bauer*, 82 F.4th 522, 528–29 (6th Cir. 2023) (citing *United States v. Robinson*, 813 F.3d 251, 255 (6th Cir. 2016)). A sufficiency of the evidence claim requires that this Court view the evidence in the light most favorable to the prosecution. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). "All reasonable inferences must be made to support the jury verdict," which results in a very high burden for the defendant. *See United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017). Factual findings by a jury will not be disturbed on appeal if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Moreover, the denial of a § 2255 motion may not be appealed unless "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1); *see also Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000) (noting that when no certificate of appealability was issued with respect to claims made by the plaintiff, this Court could not consider those claims under § 2253(c)). Because Oppong obtained a certificate of appealability only as to sufficiency of the evidence, appellate review is limited to that issue.

Moreover, we must determine if the sufficiency issue was properly preserved for appeal. A claim is subject to procedural default if it could have been made on direct appeal but is instead raised for the first time during post-conviction proceedings. *See Bousley v. United States*, 523 U.S. 614, 622 (1998). This Court has observed that "Section 2255 is not a substitute for a direct appeal." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003). To pursue a defaulted claim in

habeas, the defendant must show (1) good cause for the failure to raise it on direct appeal and prejudice if unable to proceed, or (2) actual innocence. *Bousley*, 523 U.S. at 622.

Dr. Oppong's sufficiency of the evidence claim is forfeited due to procedural default. Oppong appealed the district court's denial of his motion for a new trial to this Court but did not raise the issue of sufficiency of the evidence.[1] Rather, his argument focused almost exclusively on ineffective assistance of counsel, which is not the issue before this Court. *United States v. Oppong*, No. 21-3003, 2022 WL 1055915 (6th Cir. Apr. 8, 2022). Although Oppong has not acknowledged issue preservation in his brief, he contends that he did not challenge the sufficiency of the evidence at an earlier time because *Ruan* had not yet issued. Even assuming good cause for Oppong's failure to raise the issue on direct appeal, he has not shown prejudice if unable to proceed, and nonetheless cannot do so because his argument fails on the merits. *See Bousley*, 523 U.S. at 622.

**B. Analysis**

Dr. Oppong argues that the evidence at trial was insufficient to prove he possessed a culpable state of mind when signing blank prescriptions and therefore cannot sustain his convictions under 18 U.S.C. § 1347, 18 U.S.C. § 1035, and 21 U.S.C. § 846. He bases this assertion on *Ruan v. United States*, in an attempt to argue that his sentence should be vacated on account of *Ruan*'s heightened mens rea standard for proving a violation under 21 U.S.C. § 841.

---

[1] Oppong's argument on direct appeal largely revolved around ineffective assistance of counsel, although he did allege that the trial evidence "may meet the threshold for medical malpractice but not [a] crime," and that "negligent prescriptions are insufficient for criminal liability." *See Oppong*, 2022 WL 1055915, at *6. This language fails to preserve the sufficiency issue for collateral review because Oppong's sufficiency challenge is made under different grounds than his argument on direct appeal. In the instant matter, Oppong relies on *Ruan v. United States* and its scienter requirement, which he did not raise on direct appeal because the decision had not yet issued.

597 U.S. 450, 468 (2022). Oppong alleges that had his counsel permitted him to testify, he could have explained his thought process with respect to pre-signing the blank prescriptions. Oppong further explains that his immigrant background and "cultural desire to be helpful" motivated him to sign blank prescriptions as an "administrative convenience" rather than a knowing violation of the law. *See* Appellant's Corrected Br., ECF No. 18, 15–16. The government responds that it satisfied its burden by calling numerous witnesses to testify regarding the unlawfulness of pre-signing blank prescriptions, especially for patients who were not examined by Oppong or any other physician, a practice so unreasonable under *Ruan* as to create an inference of subjective intent.

We hold that the district court properly denied Dr. Oppong's 28 U.S.C. § 2255 motion. The evidence submitted at trial was sufficient for a reasonable fact finder to conclude that Oppong had a subjective awareness that his conduct in signing blank and incomplete prescriptions, often for patients he had never once examined, was unauthorized.

### 1. Legal Background and Application of *Ruan v. United States*

To defeat a sufficiency challenge, "[c]ircumstantial evidence alone is sufficient," and the evidence need not "exclude every reasonable hypothesis except that of guilt." *Jackson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000); *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015). Rather, circumstantial evidence is entitled to "equal weight" as direct evidence. *See Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007).

Dr. Oppong's sufficiency of the evidence challenge is based on *Ruan*, a consolidated case in which two registered physicians were convicted under 21 U.S.C. § 841 for the unauthorized dispensation of controlled substances. *Ruan*, 597 U.S. at 454. § 841 makes it a federal crime, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." Under the implementing regulation, a medical

provider is authorized to distribute controlled substances when he does so "for a legitimate medical purpose . . . acting in the usual course of his professional practice."  21 C.F.F. § 1306.04.

In *Ruan*, the Supreme Court clarified the scienter aspect to § 841's mens rea provision, holding that "knowingly or intentionally," applies to the whole of § 841, including the "except as authorized" clause.  *United States v. Anderson*, 67 F.4th 755, 764 (6th Cir. 2023) (citing *Ruan*, 597 U.S. at 454).  In other words, a defendant unlawfully distributes controlled substances only where he *knows* that he is "acting in an unauthorized manner, or intend[s] to do so."  *Ruan*, 597 U.S. at 454.  The Court explained that liability cannot turn on "the mental state of a hypothetical 'reasonable' doctor."  *Id.* at 465.  Rather, to obtain a conviction, the government must prove that the "defendant himself" subjectively knew that his acts were without a legitimate medical purpose in the usual course of professional practice.  *See id.* at 465–67.

Because of *Ruan*'s scienter requirement, Oppong argues that the government must be required to prove that he subjectively knew the prescriptions he signed were unauthorized. Although Oppong correctly states that *Ruan* requires the government to prove a doctor's knowledge or intent, his argument is foreclosed by *Ruan*'s clear instruction that the prosecution may satisfy this burden using circumstantial evidence, particularly when the defendant's actions are very unreasonable.  *Ruan*, 597 U.S. at 467.  Specifically, *Ruan* held that the government "can prove knowledge of a lack of authorization through circumstantial evidence," including by comparing a defendant doctor's "asserted beliefs" to "objective criteria" and the "accepted limits" of medical practice.  *Id.* (quotations and alterations omitted).  The "more unreasonable" a defendant's assertions appear when "measured against" circumstantial evidence of objective medical criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge."  *Id.* (quoting *Cheek v. United States*, 498 U.S. 192, 203–04 (1991)).

To that end, the government argues that Oppong's decision to pre-sign blank prescriptions for patients he had not examined, as well as sign progress notes for patients he had not examined (and who had only been examined by a pharmacist rather than a registered physician), was unreasonable. In particular, the government contends it was unreasonable for Dr. Oppong to engage in these practices given the refusal of other staff members and physicians to do so. The government further argues that the evidence at trial was sufficient to support Oppong's convictions, even in light of *Ruan*'s scienter requirement. Considering the law in this Circuit, we agree with the government.

In the factually similar case of *United States v. Bauer*, a registered physician appealed his conviction under § 841 for the unauthorized distribution of controlled substances. 82 F.4th 522 (6th Cir. 2023). *Bauer* is instructive on the sufficiency issue because this Court confirmed that *Ruan*'s mens rea standard may be satisfied by circumstantial evidence alone. This is true even if direct evidence of the physician or other authorized person's mental state is absent or lacking. *See id*. at 529.

In *Bauer*, Dr. Bauer engaged in several questionable medical practices, such as failing to comply with company policies, failing to order confirmatory diagnostic testing, prescribing opioids in the absence of injury, and prescribing opioids to potential addicts or those with mental health problems. *See id.* at 526–27. He was subsequently convicted on charges of unauthorized distribution of controlled substances under 21 U.S.C. § 841 and health care fraud under 18 U.S.C. § 1347. *Id.* at 527. On appeal, Bauer relied on *Ruan*'s mens rea requirement in an attempt to argue insufficiency of the evidence because there was not a "'scintilla of evidence' that he subjectively knew his prescriptions were unauthorized." *Id*. at 529. This Court acknowledged the absence of direct evidence in the case, but nonetheless wrote, "review of the record shows ample

circumstantial evidence from which a jury could infer that [Bauer] did have the required subjective knowledge of unauthorized distribution—evidence we must credit at this stage of review." *Id*. at 529.

For example, there was evidence that Bauer had failed to establish diagnoses, stay within dosage limits, examine patients adequately, enforce clinic policies, and attempt more conservative treatment options. *Id*. Despite no direct evidence of Bauer's culpable state of mind, this Court held that "the compounding of [] circumstantial evidence 'especially as measured against objective criteria' allows an inference that Bauer had subjective knowledge." *Bauer*, 82 F.4th at 529 (citing *Ruan,* 597 U.S. at 467). This Court further observed that § 841's language choice of "legitimate medical purpose" and "usual course of [] professional practice," shows that objective criteria are relevant circumstantial evidence that a defendant knew their conduct was unauthorized. *United States v. Bauer*, 82 F.4th at 528 (citing *Ruan*, 597 U.S. at 467).

In this case, the result is the same. Like Dr. Bauer, Dr. Oppong engaged in questionable medical practices, such as pre-signing dozens of blank prescriptions for patients he had not seen, as well as signing off on progress reports not completed by an actual physician. Dr. Oppong similarly raised *Ruan*'s mens rea standard in the instant case, in an attempt to argue that although his conduct had been unauthorized, there was no evidence of his subjective knowledge or intent to violate the law.

Indeed, there is no direct evidence of Dr. Oppong's thought process with respect to these unauthorized acts. But like *Bauer*, there is enough circumstantial evidence to infer knowledge of wrongdoing. This includes the refusal of other HWMC doctors, such as Dr. DeMint and Dr. Hatfield, to pre-sign incomplete prescriptions for Suboxone due to legal consequences, the refusal of one HWP nurse practitioner, Snyder, to pre-sign stacks of cream prescriptions due to legal

consequences, and Dr. Oppong's 25 years of experience in the medical field. Dr. Oppong pre-signed numerous prescriptions; he would write the patient's name and date of birth on a script and leave all other fields blank to be filled in by a non-physician employee. Once, when he had "somewhere to be," "he signed a bunch of the patient's charts and then a bunch of blank prescriptions so that way all the patients had prescriptions for the day." Trial Tr., R. 39, at Page ID #918–19. When Dr. Hatfield was asked whether he would engage in similar practices, he was emphatic: "No. No, no, no. No." Trial Tr., R. 38, Page ID #797. Another doctor, Donald Wharton, testified that signing an incomplete prescription is dangerous because "it's like writing a blank check." Trial Tr., R. 37, at Page ID #526. This evidence, among other testimony, demonstrates the unreasonableness of Dr. Oppong's alleged belief that he was authorized to sign incomplete or blank prescriptions for patients he had not examined, and in some cases, had not met. *See, e.g.*, *United States v. Stanton*, 103 F.4th 1204, 1212–13 (6th Cir. 2024) (finding sufficient evidence to sustain a Section 846 conspiracy conviction where the defendant "spent only a few minutes with each of his own patients before signing off on pre-printed prescriptions" for opioids).

While Dr. Bauer's violations in *Bauer* may have been more numerous than Dr. Oppong's, it cannot be said that the evidence of Dr. Oppong's subjective knowledge is so lacking that no rational fact finder could conclude that the government proved the elements of its case beyond a reasonable doubt. *See Bauer*, 82 F.4th at 529. This is true with respect to each of Dr. Oppong's convictions.

### 2. § 846 Conviction for Conspiracy

The evidence at trial was sufficient to convict Dr. Oppong for conspiracy. To prove a conspiracy under § 846, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy."

*United States v. Volkman*, 797 F.3d, 377, 390 (6th Cir. 2015). This may be inferred through circumstantial evidence. *See United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022).

For example, in *United States v. Anderson*, this Court affirmed the conspiracy convictions of a physician, Dr. Anderson, based on witness testimony at trial. 67 F.4th 755 (6th Cir. 2023). The jury heard testimony of former patients who had admitted to substance addictions and still been prescribed pain medicine by Anderson, and that physical examinations were "infrequent, cursory, or non-existent." *Id.* at 769. This evidence was bolstered by the testimony of a physician and expert witness, Dr. Timothy E. King, who determined that Anderson was not acting in the "usual course of medical practice" and therefore his issuance of prescriptions for controlled substances lacked a legitimate medical purpose. *Id*. at 762. Based on these accounts, this Court opined that "a rational juror could conclude that Anderson knowingly prescribed controlled substances without a legitimate medical purpose and outside the usual course of professional practice." *Id*. at 769. This Court also noted that Anderson's thirty years of medical experience added weight to the notion that he did not act in good faith or with a legitimate medical purpose. *See id*.

In this case, Dr. Oppong pre-signed blank or incomplete prescriptions of Suboxone for patients. Like in *Anderson*, Dr. Oppong often performed no physical examination before signing these prescriptions. The administrative assistant testified that when Dr. Oppong "had somewhere to be," he proceeded to sign "a bunch of the patient's charts and then a bunch of blank prescriptions so that way all the patients had prescriptions for the day." Trial Tr., R. 39, Page ID #919. The jury considered this evidence and found Dr. Oppong guilty on the conspiracy charge. Further, Petitioner's brief describes Oppong as a hard-working physician who practiced medicine for 25 years, and the scope of his career was also mentioned during trial. Trial Tr., R. 41, Page ID #1298

(noting that "[Oppong's] been in practice in this area for close to 30 years."). Like the physician in *Anderson*, we find it hard to believe that an experienced physician of 25 years would not be aware of the dangers inherent to signing blank prescriptions of controlled substances, especially for patients he had not personally examined. Viewed in the light most favorable to the prosecution, a rational juror could conclude from the totality of circumstantial evidence that Oppong intended to participate in a conspiracy to distribute controlled substances in violation of § 846.

### 3. Convictions for Health Care Fraud Under § 1347 and Making False Health Care Statements Under § 1035

Dr. Oppong also argues that the evidence was insufficient to support his convictions for healthcare fraud and making false healthcare statements. To prove a violation of 18 U.S.C. § 1347, the prosecution must prove that one "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *Anderson*, 67 F.4th at 770. "Direct evidence of fraudulent intent is not required." *Id*. Jurors may therefore consider circumstantial evidence to infer intent, particularly from "evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *Id*.

In *Anderson*, this Court affirmed Dr. Anderson's conviction for healthcare fraud under § 1347 because the evidence at trial was sufficient for a rational juror "to find beyond a reasonable doubt that Anderson caused claims to be submitted to Medicare and Medicaid for services that were medically unnecessary and in contravention of federal law." *Id*. at 770. This evidence included testimony that Anderson's patients filled their prescriptions at local pharmacies, expert testimony that Anderson's actions were outside the usual course of practice, and about the monetary impact on Medicare and Medicaid. *Id*. Anderson argued that since the pharmacies had

billed Medicare and Medicaid, rather than him personally, the conviction was improper. *Id*. Citing the jury instructions given, this Court reasoned that it was sufficient to "willfully cause[] an act to be done which would be a federal crime if directly performed by [Anderson] or another." *Id*. Viewed in the light most favorable to the government, this Court decided that the evidence was sufficient to sustain the conviction for healthcare fraud. *Id*.

In this case, the evidence was also sufficient for a rational juror to find beyond a reasonable doubt that Dr. Oppong engaged in healthcare fraud. Oppong signed compound cream prescriptions allowing for multiple refills without any apparent medical necessity or patient exam. The evidence shows that Oppong wrote these prescriptions for customers at the Sav-a-Lot store after HWP employees approached them, but that Oppong did not examine the individuals, thereby misrepresenting the prescriptions as being medically necessary. Although Oppong did not personally submit the false claims to benefit programs, a jury could conclude that he willfully caused them to be submitted.

Similarly, the evidence at trial was sufficient to support the conviction for false healthcare statements. The statute prohibits one from "knowingly and willfully" falsifying, concealing, or covering up a material fact by way of trick, scheme, or device. 18 U.S.C. § 1035(a). It also prohibits one from making materially false or fraudulent statements or representations, including the use of a false writing or document. *Id*. The trial evidence reflects that Dr. Oppong signed prescriptions with no demonstrated medical necessity, since he did not perform patient exams. This practice caused the submission of multiple false claims to health care benefit programs. Once again, a reasonable juror could view this evidence and conclude that Oppong knowingly made false healthcare representations.

To the extent that Dr. Oppong advances other arguments in his brief, such as the impact of improper jury instructions and ineffective assistance of counsel, they are outside the scope of the certificate of appealability and we decline to consider them.

### III.     CONCLUSION

Petitioner's sufficiency of the evidence claim is procedurally defaulted on account of his failure to raise it on direct appeal before seeking collateral review. Notwithstanding this hurdle, the case also fails on the merits. The record contains ample evidence of Dr. Oppong's willingness to sign blank and incomplete prescriptions for compound creams and Suboxone, a controlled substance, for patients he had not examined or met. While it may be true that Oppong believed he was being helpful or performing an administrative convenience, it is also true that his actions were unreasonable enough that a rational jury member could infer that he knew what he was doing and purposefully disregarded the law. Viewed in the light most favorable to the prosecution, the evidence suggests that Oppong possessed a subjective awareness that his actions were unauthorized, thereby satisfying *Ruan*'s scienter requirement. For the reasons set forth above, we **AFFIRM** the judgment of the district court.