RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

WISSAM IBRAHIM AL-SAKA,

*Petitioner*,

*v.*

JEFFERSON B. SESSIONS, III, Attorney General,

*Respondent*.

No. 17-3951

─────────────

On Petition for Review from the Board of Immigration Appeals;
No. A 047 852 874.

Decided and Filed: September 18, 2018

Before: BATCHELDER, SUTTON, and WHITE, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:** Mohamed Elsharnoby, Dearborn, Michigan, for Petitioner. Rebecca Hoffberg-Phillips, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

SUTTON, J., delivered the opinion of the court in which BATCHELDER, J., joined, and WHITE, J., joined in part. WHITE, J. (pg. 11), delivered a separate opinion concurring in all but the discussion of the applicability of the Fifth Amendment due process guarantee.

─────────────

## OPINION

─────────────

SUTTON, Circuit Judge. Wissam Ibrahim Al-Saka received permanent residency on the condition that he remain married to Hanadi Hashem, a U.S. citizen, for at least two years. He ran afoul of that condition when Michigan annulled the marriage months after he arrived here. The immigration authorities refused to waive the condition, found that Al-Saka and Hashem did not

marry in good faith, and determined that he should be removed.   We must deny Al-Saka's petition to stay.

I.

A Lebanese citizen, Al-Saka married Hashem, a U.S. citizen, in Beirut in August 1999. He entered the United States in March 2001 as a conditional permanent resident based on his marriage to Hashem.

The marriage did not last.   Just weeks after he entered the United States, the couple signed a religious divorce.   In August 2001, the Lebanese government granted a legal divorce. Two months later, Michigan annulled the marriage at Hashem's request after finding that "there had been no marital cohabitation."  A.R. 665.  All of this extinguished the condition that justified Al-Saka's permanent-residence status:  the marriage to Hashem.

Al-Saka remained in this country nonetheless.   In January 2003, he married another woman in Lebanon.  That February, he took steps to remove the permanent-residence condition. Because he had divorced Hashem, he could not file a joint petition with her, as the law requires. *See* 8 U.S.C. § 1186a(c)–(d).   He instead asked the government to waive the requirement, claiming that deportation would cause hardship and claiming that he married Hashem in good faith.  *Id.* § 1186a(c)(4)(A)–(B).

In November 2016, an immigration judge held a hearing about his request.   Al-Saka described his marriage to Hashem in Lebanon.  He said that they lived together for three months in a house his father had bought for them.  Then Hashem returned to the United States.  She later traveled back to Lebanon and stayed another five or six months before returning to the United States in January 2001.  According to Al-Saka, he followed her in March 2001 after recovering from a car accident.  Al-Saka claimed Hashem met him at the airport but seemed "a little bit cold."  A.R. 135.  He said he spent the first seven months at her house in Dearborn, Michigan. But the marriage soon fell apart.  He admitted that he traveled back and forth to Lebanon over the next several years and spent as much as eight months there during one stint.

Two of Hashem's relatives testified on Al-Saka's behalf. He also submitted written statements from various friends and family, including Hashem's mother and aunt, as well as photos from the wedding and medical reports documenting his ankle injury from the car accident.

The immigration judge denied the waiver requests and held that the government could remove him. Al-Saka's testimony, she found, lacked credibility. Although he testified that he lived with Hashem in Dearborn during his first seven months in the United States, the I-751 form submitted to U.S. Citizenship and Immigration Services in 2003 said that he spent just three weeks in Michigan before moving to Louisiana for five months. She also noted that the Michigan annulment certificate, unlike his testimony, denied any "marital cohabitation." A.R. 71. She found that Al-Saka and Hashem did not marry in good faith, and refused to waive the joint-petition requirement. She rejected his hardship claim on the ground that his family remained in Lebanon. *See* 8 U.S.C. § 1227(a)(1)(D)(i). Even if she had discretion to grant a marriage-fraud waiver, she pointed out, Al-Saka did not deserve one. *See* 8 U.S.C. § 1227(a)(1)(H).

Al-Saka appealed the decision to the Board of Immigration Appeals and added one other claim: that he received ineffective assistance of counsel. The Board affirmed.

## II.

We review the Board's decision as the final agency determination, including the parts of the immigration judge's decision the Board adopted. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Al-Saka raises three claims: (1) that the Board erred when it held that he did not marry in good faith; (2) that the Board in the alternative should have forgiven the marriage fraud and allowed him to stay anyway; and (3) that the Board as a last alternative should have remanded the case to the immigration judge for a new hearing because he received ineffective assistance of counsel at the first hearing.

*Joint Petition Waiver*. The government conditioned Al-Saka's permanent residency on his marriage to Hashem, a U.S. citizen. Someone in his position typically would need to file a joint petition with his spouse to request a release from the condition. 8 U.S.C. § 1186a(c)(1).

Al-Saka lost that option when he and Hashem divorced. To avoid removal for failure to meet the condition, he asked the government to waive the joint petition requirement and to lift the condition. The Secretary of Homeland Security, acting through the immigration authorities, may waive the requirement and remove the condition if a petitioner demonstrates that his removal would cause "extreme hardship" or that he entered the now-dissolved marriage in good faith. *Id.* § 1186a(c)(4)(A)–(B). To protect that discretion, Congress has divested us of jurisdiction to review any decision that the Immigration and Nationality Act commits to the discretion of the Attorney General or the Secretary of Homeland Security. *Id.* § 1252(a)(2)(B)(ii). That means we may not second guess how the Board assessed the weight or credibility of the evidence before coming to a decision. *Johns v. Holder*, 678 F.3d 404, 405–07 (6th Cir. 2012). We may review only "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D).

That limitation limits Al-Saka's request for relief. He says the Board erred when it found that he did not enter the marriage in good faith and denied the waiver on that ground. But he "aims the bulk of [his] fire not at the legal standards the Board applied but at its assessment of [his] credibility and the way it weighed the evidence." *Johns*, 678 F.3d at 406. One example: He faults the immigration authorities for discrediting his testimony after finding that part, but not all, of it conflicted with his past statements. Another example: He faults the immigration judge for giving little weight to the photos, affidavits, and testimonial evidence that described the couple's relationship in Lebanon. But both arguments aim at assessments committed to the Secretary's discretion and over which we lack jurisdiction. *Id*.

Perhaps appreciating the problem, Al-Saka pitches many of his claims as substantial-evidence arguments, which we may consider. *Id.* at 407. Even then, however, we may not second guess the Board's credibility and weight-of-the-evidence assessments. *Id.* Put another way: After accepting both assessments, we may decide whether substantial evidence supports the decision. *Id.* at 408.

It does. The record supports the district court's finding that the couple did not marry in good faith. Al-Saka offered no evidence that the couple owned any joint assets or bank accounts. They spent much of their time apart. Although Al-Saka said that they had intended to stay in Lebanon to build a life together, Hashem petitioned to make him a conditional permanent

resident within one month of the marriage. The I-751 form suggests that they did not live in the same State for more than a few weeks after Al-Saka arrived. Hashem did not meet him at the airport when he arrived, obtained an Islamic divorce a few weeks later, and obtained a Michigan annulment several months after that. The evidence to which Al-Saka points—wedding photos, affidavits, and his former relatives' testimony—does not compel a contrary finding. Substantial evidence, in short, supports the Board's decision to reject the joint-petition waiver and to find him deportable because he did not enter the marriage in good faith. *See* 8 U.S.C. §§ 1186a(c)(4)(B), 1227(a)(1)(G)(i).

Al-Saka says that the immigration authorities erred by focusing on the couple's relationship once they arrived in the United States rather than the span of their relationship. *See In re Laureano*, 19 I. & N. Dec. 1, 2–3 (B.I.A. 1983). That is not accurate. The immigration judge considered "all admitted evidence in its entirety" and came to a decision after a "careful review of the entire record." A.R. 61, 72. She described the evidence regarding Al-Saka's relationship with Hashem in Lebanon in detail; she just did not find it convincing.

*Fraud Waiver.* Al-Saka asks us, alternatively, to check the Board's decision to remove him even if he did commit marriage fraud. The Act gives the Attorney General discretion to waive the removal of certain aliens who meet the statutory criteria even if they "were inadmissible at the time of admission" because they committed fraud or misrepresented their status. 8 U.S.C. § 1227(a)(1)(H). We might decide whether the statute permits such a discretionary waiver, but after that our authority would end, as the Attorney General's ultimate decision to grant or deny a waiver "embodies the kind of pure discretion, unguided by legal standards, that Congress has expressly precluded aliens from challenging in a petition for review." *Singh v. Gonzales*, 451 F.3d 400, 411 (6th Cir. 2006) (quotations omitted); *see* 8 U.S.C. § 1252(a)(2)(B)(ii).

We need not reach the statutory question. The immigration judge and the Board assumed without deciding that the Attorney General could waive removal for those who commit marriage fraud. They then used that discretion to deny Al-Saka's request because the factors that weighed against a waiver outweighed those in favor of a waiver. We see no advantage to resolving the

statutory question, as our decision would make no difference to Al-Saka either way. *See INS v. Bagamasbad*, 429 U.S. 24, 25–26 (1976) (per curiam).

*Ineffective Assistance of Counsel.* Aliens subject to removal do not have a right to government-provided counsel. But they may hire their own counsel, of course. 8 U.S.C. § 1229a(b)(4). Usually immigration attorneys are good. Sometimes they are not. The Board to its credit offers an avenue for redress in the last situation. To be eligible, the individual must file an affidavit explaining the errors made by his lawyer, confirm that the lawyer knows about the claim, and state whether the individual filed a grievance with the appropriate state bar disciplinary authority. Then the individual must show that his former attorney's deficient performance prejudiced him—that, but for his counsel's deficient representation, he would have been permitted to continue residing in the United States. *In re Lozada*, 19 I. & N. Dec. 637, 638–39 (B.I.A. 1988); *see In re Compean*, 25 I. & N. Dec. 1 (A.G. 2009) (reinstating the *Lozada* framework); *see also Sako v. Gonzales*, 434 F.3d 857, 864 (6th Cir. 2006) (explaining prejudice standard). Although *Lozada* dealt with a motion to reopen, we have applied its framework when, as in this case, the alien directly petitions the court to review a Board opinion. *See Huicochea-Gomez v. INS*, 237 F.3d 696, 698–99 (6th Cir. 2001).

Al-Saka's challenge fails. The Board correctly held that Al-Saka failed to show any cognizable deficiency by counsel. His counsel's choices not to subpoena his ex-wife Hashem and her mother or to hire an expert in Islamic matrimony amount to the kinds of tactical decisions left to counsel's discretion and do not undermine the fairness of the proceeding. Perhaps more notably, Al-Saka fails to show any prejudice from the decisions. He points to no affidavit or other record evidence showing what new insights the witnesses could bring or how those insights could have changed the outcome of his case. *See Gaye v. Lynch*, 788 F.3d 519, 530–31 (6th Cir. 2015). His *Lozada/Compean* claim thus lacks merit.

One loose end needs tying. Al-Saka suggests that, even aside from his *Lozada/Compean* claim, his private lawyer's conduct violated the Fifth Amendment. That is wrong.

Before *Lozada*, it is true, a few circuits raised the possibility that aliens might be able to bring ineffective-assistance claims under the Due Process Clause's guarantee of a fair hearing in

civil disputes about deprivations of liberty or property (as opposed to the Sixth Amendment right to counsel in a criminal case). *See Paul v. INS*, 521 F.2d 194, 197–98 (5th Cir. 1975); *Magallanes-Damian v. INS*, 783 F.2d 931, 933 (9th Cir. 1986). But these were possibilities, not holdings. Before *Lozada*, no court to our knowledge held that the Board must establish an ineffective-assistance regime based on the Fifth Amendment. That leaves the possibility that the Board could permit claimants to obtain relief based on ineffective assistance at an immigration hearing through its authority to implement the immigration laws and its sound discretion in doing so. That is what we understand the Board to be doing.

That, indeed, is what the Board sees itself as doing. The Attorney General has told the Board that it has the discretion to craft an administrative remedy for ineffective-assistance claims. *See In re Compean*, 25 I. & N. Dec. at 3. Since then, the Department of Justice has promulgated a proposed rule to establish a modified *Lozada* framework in the Federal Register "based on the Attorney General's statutory authority and discretion" under the Immigration and Nationality Act. Motions to Reopen Removal, Deportation, or Exclusion Proceedings Based Upon a Claim of Ineffective Assistance of Counsel, 81 Fed. Reg. 49,556, 49,557 & n.3 (proposed July 28, 2016) (citing 8 U.S.C. §§ 1103(g)(2), 1229a).

That also is the best reading of our decisions. Yes, many of them contain references to the Due Process Clause. But they also invoke *Lozada* or later decisions of the Board. *See, e.g.*, *Sako*, 434 F.3d at 863 (noting that circuit precedent "mirror[s]" Board precedent); *Denko v. INS*, 351 F.3d 717, 722 n.3 (6th Cir. 2003); *Hamid v. Ashcroft*, 336 F.3d 465, 468 (6th Cir. 2003); *Huicochea-Gomez*, 237 F.3d at 699; *see also Mezo v. Holder*, 615 F.3d 616, 620 (6th Cir. 2010) (citing the *Lozada* analysis in *Huicochea-Gomez*). None of these published decisions establishes a Fifth Amendment right to counsel in a removal proceeding or for that matter grants relief to a claimant who cannot meet the Board's ineffective-assistance requirement but can still establish a freestanding violation of the Fifth Amendment. This reading also is consistent with the Department of Justice's view. Congress has granted the Attorney General authority to implement the immigration laws fairly through the Board and the immigration judges. 8 U.S.C. §§ 1103(g)(2), 1229a. On that basis, the Board forged a remedy for deficient legal assistance that relies not on any due process right, but on the Board's congressionally sanctioned power to

administer removal proceedings. The Justice Department, notably, continues to refine that process even while consistently noting that the Fifth Amendment does not mandate that it do so. *See, e.g.*, 81 Fed. Reg. at 49,557 n.3. Notably, the most recent refinement proposed by the Attorney General for *Lozada* claims would strengthen these protections for immigrants by linking the immigration-ineffectiveness standard to the criminal-ineffectiveness standard of the Sixth Amendment under *Strickland*. *Id.* at 49,565–66 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Continuing references to the Fifth Amendment in reviewing *Lozada* claims not only are misleading but also could potentially limit the Attorney General's efforts to offer greater protections above any constitutional floor.

No other approach makes sense. The Constitution does not guarantee a freestanding right to government-provided counsel in an immigration hearing. Start with the fount from which the right flows in the criminal context: the Sixth Amendment. All agree that it guarantees counsel only to criminal defendants; it does not apply to aliens in civil removal proceedings. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

Turn to the Fifth Amendment. It does not offer immigrants a right to effective assistance denied to them in the one constitutional provision specifically about the right to counsel. The Due Process Clause constrains the federal government, not private citizens. *Pub. Util. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461–62 (1952). It regulates private individuals only if the government coerces them or otherwise makes common cause with them in a joint activity. *See Thomas v. Nationwide Children's Hosp.*, 882 F.3d 608, 612 (6th Cir. 2018). Otherwise, an individual's private actions do not violate another individual's due process rights. *See S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542–43, 547 (1987); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 358–59 (1974).

Unlike in criminal cases, the government has no role in appointing counsel in immigration hearings because the Due Process Clause does not guarantee a right to government-provided counsel in civil litigation. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Removal proceedings are "purely civil action[s]" designed "to provide a streamlined determination of eligibility" and "put an end to a continuing violation of the immigration laws." *Lopez-Mendoza*, 468 U.S. at 1038–39. The Fifth Amendment simply does not guarantee the

right to counsel or, it follows, the right to effective counsel in removal proceedings. *See, e.g.*, *Afanwi v. Mukasey*, 526 F.3d 788, 799 (4th Cir. 2008), *vacated on other grounds*, 558 U.S. 801 (2009) (mem.); *Magala v. Gonzales*, 434 F.3d 523, 525 (7th Cir. 2005); *Singh v. Lynch*, 803 F.3d 988, 993–94 (8th Cir. 2015); *Rafiyev v. Mukasey*, 536 F.3d 853, 861 (8th Cir. 2008); *cf. United States v. Villanueva-Diaz*, 634 F.3d 844, 850–51 (5th Cir. 2011).

That is not to say that a private actor could never facilitate a Fifth Amendment "fundamental fairness" violation. Immigration hearings remain government proceedings and remain overseen by governmental actors. Aliens facing removal have a right to be heard before an immigration court that honors their due process right to a fair hearing. *See* 8 U.S.C. § 1229a(a); *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001). Congress gave immigration courts the power and responsibility to conduct removal proceedings. *See generally* 8 U.S.C. § 1229a. That includes the power and responsibility to protect the integrity of those proceedings and to ensure that the alien receives a fundamentally fair hearing. An immigration court could violate that bedrock guarantee if (for example) the judge knew that the interpreter could not accurately translate the alien's testimony and never corrected the problem. *Amadou v. INS*, 226 F.3d 724, 727 (6th Cir. 2000). So too, if the immigration court discovered that someone had bribed the alien's attorney to throw the proceeding to the government and chose not to correct the problem, a cognizable due process claim would exist. But a court could (and should) recognize that claim not because the privately retained counsel was deficient, but because the immigration judge, as clear a government actor as ever there was, failed to stop a compromised attorney from infecting the proceedings with unfairness. Such a violation arises not because the individual is a lawyer but because his actions corrupted the proceedings, the judge knew it, and the judge didn't do anything about it. An immigration judge has a due process obligation to stop anyone—lawyer, translator, or anyone else—from turning a hearing into a sham.

But poor lawyering, such as missed filing deadlines, bad litigation tactics, and the like, does not count as a due process violation merely because it rises to the level of poor lawyering. An alien has a right only to the opportunity to follow the proper procedures and to make his case before the immigration authorities. What he chooses to do with that is his own business. And his proceeding is fundamentally fair if the government gives him that opportunity. If he thinks it

will help, he may hire counsel.  But if he chooses a bad attorney, the Constitution does not give him the right to relitigate his case any more than it gives him the right to a government-hired attorney.

Linking the Board's administrative remedy (*Lozada* and *Compean*) to the Fifth Amendment by the way will not help immigrants.  The Fifth Amendment requires a proceeding to be "fundamentally unfair" before it kicks in.  *Dowling v. United States*, 493 U.S. 342, 352–53 (1990).  That is not an easy standard to meet.  It may require more than the showing of prejudice that the Board currently requires.   And it assuredly requires more than the proposed *Lozada/Compean* amendment that would require only that the immigrant satisfy the *Strickland* standard.  In trusting the federal government to administer removal proceedings, Congress did not "limit[]" it "to the very least that the Constitution demands."  *Magala*, 434 F.3d at 526.  It allowed the agency to create an administrative remedy that provides greater protections than the Fifth Amendment requires.  We should respect that remedy, and leave it at that.

We affirm.

---

**CONCURRENCE**

---

HELENE N. WHITE, Circuit Judge, concurring.  I join in the majority opinion[1] except its discussion of the applicability of the Fifth Amendment due process guarantee to counsel in immigration proceedings.  Because the *Lozada* framework satisfies any arguable constitutional due process requirements pertaining to the effective assistance of immigration counsel, I find the majority's discussion unnecessary.

---

[1]Regarding the statutory question identified by the majority opinion, I observe that although this circuit has yet to address whether the Attorney General has discretion to waive removal for those who commit marriage fraud, the Seventh and Ninth Circuits, in *Acquaah v. Sessions*, 874 F.3d 1010, 1018-19 (7th Cir. 2017) and *Vasquez v. Holder*, 602 F.3d 1003, 1015 (9th Cir. 2010), have held that the "relating to" and "directly resulting from" language in 8 U.S.C. § 1227(a)(1)(H) allows the Attorney General to waive an alien's removability on the ground that the alien was inadmissible at the time of admission due to marriage fraud and also on the related ground that the alien's conditional permanent resident status was later terminated for marriage fraud.  In *Hussam F. v. Sessions*, this court held, in a different factual context, that § 1227(a)(1)(H) allows the Attorney General to waive removability "on a derivative basis" for grounds that are distinct from, but related to, one of the grounds directly covered by § 1227(a)(1)(H), citing *Vasquez.* 897 F.3d 707, 726 (6th Cir. 2018).