NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0150n.06

No. 25-5468

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Mar 25, 2026

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| MICHAEL FLETCHER, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: BOGGS, READLER, and DAVIS, Circuit Judges.

BOGGS, Circuit Judge. Dr. Michael Fletcher appeals his convictions on three counts of distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1), stemming from prescriptions he authorized in 2016 to his patients at a pain clinic in Crestview Hills, Kentucky. Dr. Fletcher challenges the sufficiency of the evidence supporting his convictions and the validity of his waiver of counsel. He also claims that his reliance on a disbarred attorney for legal advice while proceeding pro se deprived him of due process. After careful consideration, we affirm the district court's judgment of conviction and denial of Dr. Fletcher's motion for a new trial.

**I**

A.    Factual Background.

From 2011 through 2016, Dr. Michael Fletcher practiced medicine at Interventional Pain Specialists (IPS) in Crestview Hills, Kentucky, a clinic owned by Dr. Kendall Hansen. Dr. Fletcher's practice included prescribing opioids to help relieve his patients' pain. Around this

1

time, Dr. Fletcher also served on the hearing and inquiry panels of the Kentucky Board of Medical Licensure (KBML).

Although his educational and professional background familiarized him with the dangers of and standards for prescribing opioids, Dr. Fletcher routinely prescribed high volumes of opioids without personally examining his patients or even obtaining essential information to approve such treatment. IPS "never required medical records" before accepting new patients and obtained medical records for fewer than 10% of its patients. R. 268 at 56–57, PageID 4173–74. Once accepted into IPS, patients typically received cursory examinations lasting under 15 minutes, and "it was very unusual" for them "to see a doctor." R. 268 at 135, PageID 4252. But opioid prescriptions flowed freely. Dr. Fletcher developed a reputation for signing more prescriptions than other doctors at IPS, with staff observing Dr. Fletcher signing "stacks" of prescriptions at a time. R. 268 at 27, PageID 4144. He authorized such an extreme volume of opioid prescriptions that IPS's medical-billing specialist warned him that she would not file his claims with a government agency because his numbers "would have thrown up red flags." R. 268 at 28–29, PageID 4145–46.

Moreover, it was common knowledge among IPS staff that many of the clinic's patients— 10% to 25%, according to one witness's estimate—displayed signs of substance abuse. Patients refused alternative treatments, "nodd[ed] out" in the clinic lobby, claimed to have "accidentally lost" pills despite returning bottles with powder residue, and required hospitalization for drug overdoses. R. 268 at 89–90, 94–95, 99, 187–205, PageID 4206–07, 4211–12, 4216, 4304–4322; R. 269 at 50, 224, PageID 4395, 4569. Dr. Fletcher reflected to a colleague that he authorized a "crazy" number of prescriptions, but still the volume of prescriptions did not abate and the practices for evaluating patients did not improve. R. 268 at 96, PageID 4213.

Charles Hickman and Steven Kasselmann sought care from Dr. Fletcher. Both had a history of substance abuse, but Dr. Fletcher never performed the comprehensive review necessary under KBML standards to initiate treatment with opioids. He nevertheless prescribed them opioids. KBML standards further directed doctors to decrease or cease opioid prescriptions if a patient demonstrates signs of substance abuse or if the medication fails to alleviate their pain. But Dr. Fletcher continued to prescribe opioids for both patients even after Hickman tested positive for cocaine in April 2016 and after Kasselmann, who never reported an improvement in his pain, tested negative for his prescribed oxycodone in June 2016, a sign of noncompliance with medical directives and resale of the drugs. Both Hickman and Kasselmann have since passed away from drug overdoses, with Hickman's death occurring shortly after receiving his final prescription from Dr. Fletcher.

B.      Procedural History.

On August 4, 2022, a superseding indictment charged Dr. Fletcher with one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, and three counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). The indictment alleged that Dr. Fletcher conspired with Dr. Hansen to unlawfully prescribe opioids. The three distribution counts stemmed from prescriptions Dr. Fletcher issued to Hickman and Kasselmann in June and August of 2016. Dr. Hansen also was charged with conspiracy and distribution counts.

Dr. Fletcher initially proceeded through counsel, but his attorneys filed a motion to withdraw in July 2023, citing a breakdown in communications. Shortly afterward, Dr. Fletcher declared his intention to proceed pro se. On August 21, 2023, Magistrate Judge Candace J. Smith conducted a hearing to consider Dr. Fletcher's request and found, after detailed questioning, that Dr. Fletcher had validly waived his right to counsel. The court did not appoint standby counsel.

The parties agree that Dr. Fletcher validly waived his right to counsel at this point under *Faretta v. California*, 422 U.S. 806 (1975), with the magistrate judge conducting a colloquy modeled on the *Bench Book for United States District Judges* to warn Dr. Fletcher of the dangers of self-representation.

Dr. Fletcher represented himself for nine months following his August 2023 waiver of counsel. He presented argument in hearings, filed motions (including a motion for a bench trial, which the district court granted), and reviewed discovery. He even participated in a final pretrial conference and came within just a few days of beginning trial before the district court severed Dr. Hansen's trial in January 2024. (Dr. Hansen proceeded to trial that month, and a jury acquitted him on all counts). But about six weeks before his rescheduled trial date of June 17, 2024, Dr. Fletcher requested that the district court appoint him counsel. Within a week, Dr. Fletcher changed course again, advising the district court that he would retain attorney Alan Statman to represent him. Statman entered his notice of appearance on May 21.

Problems soon arose with Statman's representation. On May 31, the government notified the district court of a potential conflict of interest, explaining that Statman's representation in civil litigation against Dr. Hansen disqualified him from representing Dr. Fletcher. On June 4, Statman filed a response requesting permission to withdraw as counsel, indicating that he would not challenge the conflict, that he had advised Dr. Fletcher of the conflict, and that Dr. Fletcher "ha[d] not waived the conflict." R. 233 at 1, PageID 3176. Judge Bunning scheduled a telephonic conflict-of-interest hearing for June 6.

At the June 6 hearing, Dr. Fletcher, Statman, and the government identified themselves as participants on the call. Statman reiterated his belief that his civil litigation against Dr. Hansen in medical-malpractice cases brought by IPS patients created a conflict of interest. The district judge

then asked Dr. Fletcher to confirm that he would not waive any conflict of interest, to which Dr. Fletcher responded that he was "very surprised and shocked by these developments" and said that "if it's at all possible, [he] would like for Mr. Statman to be able to represent [him]." R. 264 at 6, PageID 3555. After turning to the government for more details regarding Statman's potential conflict, the judge summarized the rules for evaluating whether to disqualify Statman and explained that Dr. Fletcher had "the right to a lawyer who doesn't have a conflict." R. 264 at 7–9, PageID 3556–58. This set the stage for the following exchange:

| | |
|---|---|
| The Court: | Have you spoken with anybody else, Dr. Fletcher, about this issue other than Mr. Statman? This potential conflict. |
| Dr. Fletcher: | Well, again, I just learned about it recently. It's also amazingly complicated to me about the protocols and the legalities. It's insanity, as far as I'm concerned. |
| | But let me say to you, Judge, I don't want or need a lawyer. Mr. Statman can go on his way. I'm not going to waive my right to this conflict, and I will be there a week from Monday for the trial to go forth, and I'll represent myself pro se – |
| The Court: | Okay. Well, if you want to do that – |
| Dr. Fletcher: | – and I'm happy to do that. |
| The Court: | – that's your call. That's your call. I'm not involved in that, other than to advise you of this potential issue. . . . |

R. 264 at 9, PageID 3558.

Without asking any questions to confirm Dr. Fletcher's stated intent to proceed pro se and without issuing any warning about the dangers of self-representation, the district court granted Statman's motion to withdraw and allowed Dr. Fletcher to again represent himself. The judge did not engage in a *Bench Book*-style colloquy because, he said in concluding the call, Dr. Fletcher had already received "a lengthy *Faretta* hearing with [Magistrate] Judge Smith that's part of the record in this matter." R. 264 at 10–11, PageID 3559–60.

Dr. Fletcher's bench trial commenced a week and a half later on June 17. At trial, the district court heard expert testimony from several doctors who compared Dr. Fletcher's practice to the governing standards of care. The court also heard lay testimony from IPS staff, IPS patients and their relatives, a KBML attorney, and investigators. It received dozens of medical records, including IPS patient files, pharmacy prescription records, and toxicology and autopsy reports. Dr. Fletcher objected to just two pieces of evidence: IPS records for patient Vernon Adkins and IPS's evacuation map. He did not specify his objection to the Adkins records, stating "I don't know" when asked to provide his ground for objecting. R. 266 at 35, PageID 3604. The judge admitted the record under Federal Rule of Evidence 803(6).

On July 19, 2024, the district judge convicted Dr. Fletcher on the three distribution counts but acquitted him of conspiring with Dr. Hansen. Later that month, Dr. Fletcher requested appointed counsel, and the district court appointed CJA attorney Eric Eckes to represent him. Dr. Fletcher, through Eckes, then moved for a new trial, asserting two grounds for relief. First, Dr. Fletcher argued that the district court deprived him of his right to counsel by allowing Dr. Fletcher to represent himself following the June 6 hearing, because Dr. Fletcher had made inconsistent statements regarding his representation preference and did not receive a new *Faretta* warning. Second, in a development that surprised the district court and the government, Dr. Fletcher revealed that, while representing himself, he had taken legal advice from disbarred attorney Eric Deters, which Dr. Fletcher claimed deprived him of due process.

Deters has been disciplined repeatedly in multiple jurisdictions and has not been licensed to practice law in Kentucky since 2013, as court records and media reports document. *See Deters v. Ky. Bar Ass'n*, 627 S.W.3d 917, 919 (Ky. 2021). By July of 2023—when Dr. Fletcher's original attorneys moved to withdraw—Deters had become acquainted with Dr. Fletcher and persuaded

him to proceed pro se.  The two signed an agreement providing that "Deters will advise, counsel and make suggestions in [Dr. Fletcher's] criminal defense as a friend only," with Dr. Fletcher "acknowledg[ing] [that] Eric Deters is a retired lawyer with no license."  R. 273-1, PageID 4783.

Over the next nine months, Deters counseled Dr. Fletcher on a variety of strategic issues, advising him to move for a bench trial and to meet with prosecutors to "tell them everything about his case, his defense, and Dr. Hansen."  Appellant Br. 8–9.  Dr. Fletcher claims that Deters had a preexisting relationship with Statman and hoped to guide Dr. Fletcher's defense in a manner that would benefit Statman's civil litigation against Dr. Hansen.  This motive spurred Deters to intervene when Dr. Fletcher requested appointed counsel in May 2024.  Deters "arranged" for Statman to represent Dr. Fletcher, allegedly in return for Dr. Fletcher providing an affidavit for Statman to use in his civil litigation.  *Id.* at 10.  During the June 6 telephonic hearing, Deters sat with Statman, unannounced to the court, and texted Dr. Fletcher, allegedly instructing him to "[r]emember [his] script" and ultimately drop his request for counsel.  *Ibid.* (first alteration in original) (citation omitted).

The district court denied Dr. Fletcher's motion for a new trial, concluding (1) that Dr. Fletcher unequivocally re-waived his right to counsel at the June 6 hearing by making five statements expressing his intent to proceed pro se, (2) that Dr. Fletcher had a mere "interim change of heart" that did not entitle him to a second *Faretta* colloquy, and (3) that Deters's involvement did not deprive Dr. Fletcher of due process because the court lacked "any duty to police a Defendant's, *pro se* or otherwise, personal communications or choices."  R. 295 at 6–10, PageID 5305–5309.  On May 8, 2025, the district court sentenced Dr. Fletcher to three years of probation and ten months of home confinement; the court terminated home confinement in November.  Dr. Fletcher timely appealed.

**II**

Dr. Fletcher seeks reversal by arguing that insufficient evidence supports his convictions. To buttress his sufficiency claim, he asserts that the district court erred in admitting IPS patient records. Alternatively, he seeks a new trial by claiming that the district court deprived him of his right to counsel and that Deters's involvement in his defense denied him due process. We address each claim in turn, finding that sufficient evidence supports Dr. Fletcher's convictions even without the challenged medical records and concluding that the district court did not deprive him of his rights to counsel or due process.

A.    Sufficiency of the Evidence.

Dr. Fletcher challenges the sufficiency of the evidence supporting his conviction by claiming that the government failed to prove that he knowingly or intentionally violated 21 U.S.C. § 841(a)(1). He prefaces his sufficiency challenge by arguing that the district court erred by admitting IPS patient records because the government did not satisfy the foundational requirements under Fed. R. Evid. 803(6)(D). We address these issues first because a successful sufficiency challenge bars a retrial. *See Burks v. United States*, 437 U.S. 1, 17–18 (1978); *United States v. Arnold*, 486 F.3d 177, 180 (6th Cir. 2007) (en banc) (collecting cases). But Dr. Fletcher's sufficiency claim fails. Even without considering the challenged medical records, sufficient evidence supports his convictions.

When reviewing a bench-trial conviction for sufficient evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vance*, 956 F.3d 846, 853 (6th Cir. 2020) (citation modified). Consistent with this demanding standard,

"[t]his court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *Ibid.* (citation modified).

The district court convicted Dr. Fletcher on three counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), stemming from prescriptions issued to IPS patients Charles Hickman and Steven Kasselmann in 2016. Each charge required the government to prove four elements beyond a reasonable doubt: (1) that Dr. Fletcher knowingly or intentionally distributed a controlled substance, (2) that he knew at the time of the distribution that the substance was a controlled substance, (3) that his distribution was unauthorized, and (4) that he knew or intended that his distribution was unauthorized. *See* 21 U.S.C. § 841(a)(1); *United States v. Anderson*, 67 F.4th 755, 769 (6th Cir. 2023) (per curiam); 6th Cir. Crim. PJI 14.02B. Dr. Fletcher attacks only the proof for the fourth element, which requires the government to demonstrate "that the defendant knowingly or intentionally acted in an unauthorized manner." *Ruan v. United States*, 597 U.S. 450, 457 (2022). "[A] prescription is only authorized when a doctor issues it 'for a legitimate medical purpose . . . acting in the usual course of his professional practice.'" *Id.* at 454 (quoting 21 C.F.R. § 1306.04(a) (2021)); *United States v. Campbell*, 135 F.4th 376, 386 (6th Cir. 2025).

Expert testimony established that Dr. Fletcher's prescriptions to Hickman and Kasselmann were unauthorized because they lacked a legitimate medical purpose. Dr. Timothy King, a physician with 40 years of experience in pain management, opined about the discrepancies between Dr. Fletcher's treatment of Hickman and Kasselmann and the appropriate standard of care. The district court found his testimony more credible than that of Dr. Fletcher's expert witness. Dr. King explained that opioids "are not the default choice" for managing pain. R. 266 at 215, PageID 3784. KBML standards provide that any opioid prescription requires "a complete

psychosocial review" accounting for various risk factors, including a patient's history of substance abuse. R. 266 at 216, PageID 3785. Prescriptions must be accompanied by compliance conditions. Violations of those conditions, indicated by "an inconsistent or abnormal urine drug test," "cannot be ignored." R. 266 at 218, PageID 3787. Those warning signs warrant "a mandatory change in treatment" under KBML standards, with options including weaning a patient's dosage, ceasing opioid prescriptions altogether, or referring the patient for substance-abuse treatment. R. 266 at 218–19, PageID 3787–88. Even without signs of substance abuse, a doctor should discontinue opioid prescriptions if the medications fail to relieve a patient's pain.

Dr. King opined that the prescriptions to Hickman and Kasselmann charged in the indictment departed from the usual course of professional practice. He identified many red flags that Dr. Fletcher ignored in initially prescribing opioids to Hickman and Kasselman and in supervising their treatment. Dr. King explained that Dr. Fletcher failed to perform the psychosocial reviews necessary to initiate treatment with opioids because he failed to obtain patients' prior medical records, neglected to consider patients' substance-abuse issues, overlooked serious comorbidities, and prescribed opioids in conjunction with other drugs that heightened the risk of substance abuse. For Hickman and Kasselmann specifically, Dr. King found Dr. Fletcher's management of their treatment deficient because he continued to prescribe them opioids despite manifest signs of drug abuse and minimal pain relief. For example, Dr. Fletcher continued to prescribe opioids for Hickman despite Hickman's admission to overusing his medication and his visible intoxication during an office visit. Likewise, Dr. Fletcher never altered Kasselmann's treatment despite his testing negative for his prescribed hydrocodone—a sign that Kasselmann had sold or otherwise repurposed his drugs. This testimony established that Dr. Fletcher's

prescriptions to Hickman and Kasselmann lacked a legitimate medical purpose, rendering them unauthorized.

Attempting to escape the force of this testimony, Dr. Fletcher notes that Dr. King relied upon the same IPS patient records that Dr. Fletcher seeks to exclude from evidence. But even assuming that the district court should have excluded the IPS records, a testifying expert may rely on inadmissible hearsay to form the basis of his opinion. Fed. R. Evid. 703; *United States v. Jaffal*, 79 F.4th 582, 599 (6th Cir. 2023). And there is no issue with Dr. King expressing opinions on Dr. Fletcher's deviation from accepted medical practices even though such opinions "embrace[] an ultimate issue" concerning a non-mental-state offense element—especially in the context of a bench trial, where there is no risk in the witness conveying "erroneous legal standards to the jury." Fed. R. Evid. 704; *United States v. Mooney*, 135 F.4th 486, 496 (6th Cir. 2025) (citation modified).

Turning to the challenged state-of-mind element, the government needed to prove that Dr. Fletcher at the very least *knew* that these prescriptions were unauthorized. *See Ruan*, 597 U.S. at 457. Knowledge can be established from circumstantial evidence. *See Staples v. United States*, 511 U.S. 600, 615–16 n.11 (1994). Post-*Ruan*, we have understood that knowledge can be inferred where record evidence shows that a doctor prescribed controlled substances to patients despite the high probability that the controlled substances were being dispensed or distributed outside the course of professional practice for an illegitimate purpose or that patients were diverting the controlled substances. *United States v. Stanton*, 103 F.4th 1204, 1213 (6th Cir. 2024). Put another way, direct evidence of deliberate indifference to obvious risks can amount to circumstantial evidence of knowledge. *Ibid.*

Here, the evidence established that Dr. Fletcher was aware of a high probability that the controlled substances were distributed without a legitimate medical purpose and deliberately

"closed his eyes" to obvious warnings. *Anderson*, 67 F.4th at 766; *see also Stanton*, 103 F.4th at 1213. Dr. Fletcher's KBML service and professional background apprised him of the proper standards of care and risks present among the local patient population. IPS employees testified that Dr. Fletcher routinely "sign[ed] prescriptions without reviewing the medical records of the patients or speaking to the patients." R. 251 at 15, PageID 3435. Dr. Fletcher did not even *request* medical records from other providers in most cases. Rather than evaluating patients personally, Dr. Fletcher delegated examinations to medical assistants. Dr. Fletcher would frequently sign prescriptions for his own patients, and even Dr. Hansen's patients, without meeting them. All of this proceeded at a brisk pace and high volume. IPS's medical-billing specialist feared that Dr. Fletcher's prescriptions would attract regulatory scrutiny because he routinely certified that he met with 50 patients daily, even though "there was no way there was enough time in the day to see all those patients." R. 268 at 28, PageID 4145.

These practices provide circumstantial evidence that Dr. Fletcher knew that he was prescribing opioids without an authorized purpose. Dr. Fletcher openly expressed concerns to other IPS employees about the high rate at which the clinic was "sending [pills] out into the community." R. 268 at 95, PageID 4212. He indicated to a nurse that he thought the prescription volume was "crazy" and "a lot," but "didn't really act concerned" about the risks that this volume created. R. 268 at 96, PageID 4213. His concerns were well-founded. Witnesses testified that during Dr. Fletcher's tenure at IPS, multiple patients died, others required hospitalization for overdosing, and still others displayed obvious signs of substance abuse within the clinic, "nodding out" and experiencing "the bends" in the IPS waiting room. R. 268 at 94–95, 187–205, PageID 4211–12, 4304–4322. These issues were common knowledge among the IPS staff. But despite these alarm bells, Dr. Fletcher never changed his procedures for evaluating patients. He continued

to authorize a high volume of prescriptions even relative to other IPS providers and would sign piles of prescriptions at a time. By refusing to implement safeguards despite his awareness of the risks his practice created, he "deliberately closed his eyes to what was obvious," *Anderson*, 67 F.4th at 766, allowing for an inference that satisfied the state-of-mind element, *Stanton*, 103 F.4th at 1213.

Like other cases where doctors prescribed high volumes of opioids despite "infrequent, cursory, or non-existent" examinations that "fell far short of professional practice," the evidence of Dr. Fletcher's deliberate ignorance to the high probability that his prescriptions to Hickman and Kasselmann lacked a legitimate medical purpose supported the final element of the offense. *Anderson*, 67 F.4th at 769. Sufficient evidence supports Dr. Fletcher's convictions even without relying on the IPS medical records, which renders harmless any error in admitting them. *United States v. Johnson*, 581 F.3d 320, 332 (6th Cir. 2009).

B.      Waiver of Counsel.

Dr. Fletcher next contends that the district court deprived him of his right to counsel by allowing him to proceed pro se at trial. There is no dispute that Dr. Fletcher validly waived his right to counsel and proceeded pro se for nine months following his *Faretta* hearing with the magistrate judge in August 2023. The question is whether, after reasserting his right to counsel in May 2024, he validly waived his right to counsel *a second time* at the June 6, 2024, hearing. The district court's haste in accepting Dr. Fletcher's second waiver of counsel gives us pause, especially because it did not ask any questions or issue any warnings to confirm Dr. Fletcher's intent to proceed pro se or his understanding of the dangers of self-representation. But the totality of the circumstances in Dr. Fletcher's case, including his fresh experience representing himself for nine

months before reasserting the right to counsel and his confident statements at the June 6 hearing, assure us that he validly waived his right to counsel.

The Sixth Amendment grants criminal defendants the right to counsel and, conversely, the right to represent themselves. *Iowa v. Tovar*, 541 U.S. 77, 87–88 (2004); *United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017). To invoke the right to self-representation, a defendant must make a "knowing, voluntary, and intelligent" waiver of the right to counsel. *Tovar*, U.S. 541 at 88; *see also Faretta*, 422 U.S. at 835. Violations of these rights—whether by allowing a defendant to represent himself despite an invalid waiver of counsel or by refusing to allow a defendant to represent himself despite a valid waiver of counsel—constitutes structural error that warrants a new trial. *Jones v. Jamrog*, 414 F.3d 585, 594 (6th Cir. 2005). On direct appeal, we ordinarily review the validity of a defendant's initial waiver of counsel de novo. *United States v. Johnson*, 24 F.4th 590, 600–01 (6th Cir. 2022). Both parties have asked us to apply that standard to Dr. Fletcher's second waiver.

To respect the right to counsel and guard against procedural manipulation, this court has adopted a two-step approach to evaluate a defendant's purported initial waiver of his rights. *United States v. Cromer*, 389 F.3d 662, 683 (6th Cir. 2004); *United States v. Evans*, 559 F. App'x 475, 480 (6th Cir. 2014). First, the defendant must make a "clear and unequivocal assertion of [his] right to self-representation." *Cromer*, 389 F.3d at 683. Second, the district court must ensure that the defendant's waiver is knowing, intelligent, and voluntary by warning him of "the dangers and disadvantages of self-representation." *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (en banc). While the defendant need not possess "the skill and experience of a lawyer in order competently and intelligently to choose self-representation," the record must establish that the defendant "knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (citation

modified). The parties agree and we likewise assume that this same framework governs Dr. Fletcher's reassertion of his *Faretta* rights at the June 6 hearing following his efforts to retain counsel.

We conclude at the first step that Dr. Fletcher unequivocally waived his right to counsel, even though he characterizes his statements at the June 6 hearing as contradictory. Several principles govern our review. No magic words are needed to waive the right to counsel, *Cassano v. Shoop*, 1 F.4th 458, 473 (6th Cir. 2021), although repeated and insistent expressions of an intent to proceed pro se provide strong evidence of an unequivocal waiver, *see Wilson v. Walker*, 204 F.3d 33, 37 (2d Cir. 2000) (per curiam). A waiver of counsel can be unequivocal even if the defendant's desire to proceed pro se was conditioned on the impossibility or unattractiveness of other representation options. *Moore v. Haviland*, 531 F.3d 393, 402 (6th Cir. 2008); *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir. 1994). "[E]quivocal statements earlier in the [same] hearing" do not necessarily "taint[]" the defendant's "final, unequivocal waiver of counsel." *United States v. Audette*, 923 F.3d 1227, 1234–35 (9th Cir. 2019). And we can consider the defendant's conduct in the litigation as a whole to assess whether he meant what he said. *See Cromer*, 389 F.3d at 682–83.

At the June 6 hearing, Dr. Fletcher made five clear statements in short order indicating his desire to proceed pro se, as the transcript quoted in Part I-B reveals. True, his insistence that he did not "want or need a lawyer" followed a discussion about the possibility of Statman representing Dr. Fletcher despite a potential conflict of interest. R. 264 at 9, PageID 3558. Dr. Fletcher entered the June 6 hearing hoping that Statman could represent him, an aspiration perhaps contradicted by Statman's filing on June 4 that he had explained the conflict to Dr. Fletcher and Dr. Fletcher had not waived it. But while he expressed exasperation at conflicts-of-interest rules, his waiver

followed the district court's explanation of the framework for evaluating potential conflicts and the court's reminder to Dr. Fletcher of his "right to a lawyer who doesn't have a conflict." R. 264 at 8–9, PageID 3557–58. In this context, Dr. Fletcher's ultimate decision to proceed pro se reflects not equivocation as much as an "informed decision" about whether representation by a lawyer with an apparent conflict of interest would serve his best interests. *Williams*, 44 F.3d at 100–01.

The fact that he conditioned his preference to proceed pro se on the impossibility or undesirability of Statman's representation does not diminish the validity of his waiver. *Moore*, 531 F.3d at 402 (explaining that a "request to proceed pro se was no less voluntary because it was contingent on the denial of other options that [the defendant] might also find palatable"). Neither does the fact that Dr. Fletcher resolved this decision tree—representation by Statman, if Statman lacked a conflict of interest, and if not, self-representation—during the hearing, especially because the judge's explanation appears to have helped Dr. Fletcher reach his final decision. *Cf. Audette*, 923 F.3d at 1232, 1235 (finding the defendant's waiver of counsel unequivocal just a few minutes after the defendant stated that he was "scared to death to represent [him]self" because the defendant briefly conferred with counsel and "grappled with the difficult decision").

Dr. Fletcher's behavior throughout litigation confirms the unequivocal nature of his waiver. His decision to represent himself pro se comports with his preceding nine months of self-representation, lending credibility to his willingness to "assume[] the whole of his representation." *Cromer*, 389 F.3d at 683. Although Statman briefly represented Dr. Fletcher from late May through early June 2024, Statman's sole contribution to the docket was his June 4 response to the government's notice of a potential conflict. So, for the ten months between Dr. Fletcher's initial waiver of counsel on August 21, 2023, and the conclusion of his trial on June 26, 2024, no licensed attorney performed a single legal service on Dr. Fletcher's behalf, at least as far as the docket

shows. As a matter of official record, Dr. Fletcher essentially managed his entire defense, including preparation for the once-imminent joint trial with Dr. Hansen. And he never seriously entertained legal representation by anyone other than Statman, as demonstrated by the quick withdrawal of Dr. Fletcher's request for appointed counsel in favor of retaining Statman in May 2024 and the absence of any further request for counsel until after his conviction.

Deters's surreptitious advice during the June 6 hearing does not compel a contrary conclusion, even if it influenced Dr. Fletcher. If anything, it reinforces the unequivocal nature of Dr. Fletcher's decision, given that he had consistently followed Deters's advice. Any hurry, pressure, or confusion Dr. Fletcher may have experienced on June 6 traced neither to his putative attorney of record, who represented that he had explained the conflict on June 4, nor to the judge, who explained Dr. Fletcher's options and respected his choice. *Cf. Stenson v. Lambert*, 504 F.3d 873, 879, 884 (9th Cir. 2007) (finding a defendant's attempted waiver of counsel *invalid* where he simultaneously said that he "really [did] not want to proceed without counsel" and believed that the trial judge and his attorney were "forcing" him to represent himself) (alteration in original). Dr. Fletcher unequivocally asserted his right to self-representation.

Moving to the second step of the waiver-of-counsel analysis, we hold that Dr. Fletcher waived his right to counsel knowingly, intelligently, and voluntarily because the record as a whole indicates that Dr. Fletcher made his decision with "eyes open" to the dangers of self-representation. *Faretta*, 422 U.S. at 835 (citation modified). Dr. Fletcher contends that his retention of Statman required the district court to perform a *Bench Book*-style colloquy, at least in part, before accepting his subsequent waiver. But the facts that Dr. Fletcher had previously received a thorough *Faretta* colloquy, performed substantive work in representing himself for nine months, reasserted the right

to counsel for just a few weeks, and never expressed reservations about proceeding pro se after the June 6 hearing (until after his conviction) combine to demonstrate a valid waiver of counsel.

Because a pro se defendant "relinquishes . . . many of the traditional benefits associated with the right to counsel," a waiver is ineffective unless he "'knowingly and intelligently' forgo[es] those relinquished benefits." *Faretta*, 422 U.S. at 835 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938)). The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Ibid.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). But the Supreme Court has never "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel." *Tovar*, 541 U.S. at 88. "The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors." *Ibid.*

To perform this inquiry into a defendant's appreciation of the dangers of self-representation, we have long instructed our district courts to "ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004). We also have suggested in considering the right to counsel at sentencing that "an explicit revocation by the defendant" of his waiver of counsel should trigger a "renewed inquiry of the defendant" if he subsequently seeks to waive that right again. *Id.* at 367. But because the defendant in *McBride* never "revoke[d] his previous waiver of counsel," we had no occasion to articulate what sort of inquiry is needed to evaluate a defendant's attempt at a second waiver of the right to counsel following an express revocation, whether at sentencing or at an earlier stage in the proceeding, as here. *Id.* at 368.

Dr. Fletcher urges that the inquiry required to permit him to waive his right to counsel again necessitates a second *Bench Book*-style colloquy. We understand *McBride*'s reference to a renewed "inquiry" differently. *See* 362 F.3d at 367. True, a district court—subject to appellate review—must ensure that the defendant seeking to waive the right to counsel does so knowingly, intelligently, and voluntarily. *See Faretta*, 422 U.S. at 835. But a second colloquy is not always needed after a defendant reasserts his waiver of the right to counsel.

The essence of *Faretta* is an appreciation of the hazards of self-representation, not the mechanical recitation of certain questions and answers. *See Faretta*, 422 U.S. at 835; *Tovar*, 541 U.S. at 88. Our insistence on an initial *Bench Book*-style colloquy helps ensure that the defendant's waiver is knowing, intelligent, and voluntary because it forces the defendant to confront specific disadvantages of proceeding pro se. *Powell*, 847 F.3d at 774. But a defendant who has already represented himself—especially one who has filed motions, reviewed discovery, and participated at hearings—is far more acquainted with those risks than a defendant contemplating waiving his right to counsel for the first time. For at least some defendants with pro se experience, a second *Faretta* warning in the same case is not necessary to ensure that a second waiver of the right to counsel is made with "eyes open." *Faretta*, 422 U.S. at 835 (citation modified). Experience impresses the perils of self-representation upon that defendant as much as any dialogue.

Other than noting that Dr. Fletcher had already received a full *Faretta* colloquy (ten months prior), the district court did not explain at the June 6 hearing why it deemed Dr. Fletcher's waiver valid. Although the better practice may very well be for the district court to conduct a fuller inquiry, the record nevertheless equips us to perform *our* inquiry. We find that Dr. Fletcher knowingly and intelligently waived his right to counsel (he does not contest voluntariness).

Following his concededly compliant *Faretta* hearing with the magistrate judge, Dr. Fletcher represented himself for nine months. During this time, he filed a host of motions, reviewed discovery, and participated in hearings. By January 2024, months before he wavered about his self-representation, he had participated in a final pretrial conference and came within just a few days of beginning trial before the district court severed Dr. Hansen's trial. Even when Dr. Fletcher eventually reasserted his right to counsel, Statman represented him for just a couple of weeks and, other than responding to his apparent conflict of interest, never filed any motions or appeared at any hearings on Dr. Fletcher's behalf. Nothing about the charges or evidence against Dr. Fletcher changed during Statman's brief representation, so Dr. Fletcher understood the task ahead of him when he re-waived his right to counsel. *See United States v. Clark*, 774 F.3d 1108, 1113 (7th Cir. 2014) (explaining that renewed *Faretta* warnings are appropriate when the government reveals plans to introduce more complex evidence than previously contemplated). During the June 6 hearing itself, Dr. Fletcher expressed his waiver confidently and never balked when, after announcing his intent to proceed pro se, the district court explained technical procedures for objecting to evidence at trial. And Dr. Fletcher never indicated second thoughts about his decision to represent himself at trial. We are confident that Dr. Fletcher resumed self-representation with full knowledge of the dangers of self-representation.

At oral argument, Dr. Fletcher insisted that a second *Faretta* colloquy was necessary if not to *educate* but rather to *warn*, or at least slow down Dr. Fletcher's decision-making process. But this conception of *Faretta* for experienced pro se defendants risks placing district courts between a rock and a hard place, because a district court must respect a defendant's informed decision to waive counsel. The delicate balance district courts must strike—ensuring defendants understand the consequences of proceeding pro se without burdening that choice—reminds us that

waiver-of-counsel proceedings can burden "the efficient and effective administration of criminal justice." *United States v. Coles*, 695 F.3d 559, 562 (6th Cir. 2012) (citation modified). They create vulnerabilities for crafty defendants to play "game[s]" with courts, *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988) (citation modified), with the potential for significant reward because a *Faretta* violation requires a new trial, *Jamrog*, 414 F.3d at 594. Few cases could exemplify those risks better than this one, in which a defendant who was ready to represent himself at trial months earlier subsequently attempted to retain a conflicted lawyer (Statman) at the urging of a disbarred attorney (Deters), whose entire involvement the defendant concealed from the court.

Prudence would counsel the district court to ask *some* questions even of a defendant seeking to waive counsel a second time. In some cases, depending in part on the duration and context of the defendant's reassertion of the right to counsel, at least an abbreviated *Bench Book*-style colloquy may be necessary before a district court can accept a second waiver. But this is not that case. Dr. Fletcher's waiver was valid because the totality of the circumstances confirms that he understood the "dangers and disadvantages of self-representation." *Faretta*, 422 U.S. at 835.

C.     Due Process.

Dr. Fletcher also asserts that Deters's involvement in his defense deprived him of his due-process rights. We review the district court's determination of a due-process violation de novo. *See United States v. Rafidi*, 829 F.3d 437, 446–47 (6th Cir. 2016). Deters's extensive participation in Dr. Fletcher's self-representation may well constitute unauthorized practice of law. But Dr. Fletcher's secret reliance on an unlicensed attorney to guide his self-representation does not amount to a due-process violation because Deters's involvement cannot be connected to state action.

"The Due Process Clause constrains the federal government, not private citizens." *Al-Saka v. Sessions*, 904 F.3d 427, 433 (6th Cir. 2018) (citation modified). A due-process claim therefore requires a connection between the alleged deprivation and conduct "fairly attributable to the state." *Lindke v. Freed*, 601 U.S. 187, 198 (2024) (citation modified). A criminal trial, "a proceeding initiated and conducted by the State itself," constitutes state action. *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980). Courts have a due-process obligation to ensure that they respect "fundamental fairness" and prevent their proceedings from turning "into a sham." *Al-Saka*, 904 F.3d at 434; *see also Cuyler*, 446 U.S. at 343–44. But not all private conduct during trial counts as state action. While ineffective assistance of counsel may give rise to a due-process violation, *see Cuyler*, 446 U.S. at 344, defense attorneys—even public defenders paid by the state—are not state actors "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *see also Lindke*, 601 U.S. at 198–99.

Dr. Fletcher cannot trace his reliance on Deters's advice to state action. If a public defender is not a state actor, even less so is a disbarred attorney who secretly advises a pro se defendant. No matter the degree to which Deters influenced Dr. Fletcher, Dr. Fletcher cannot chart the "necessary lineage" between the government and Deters's private, unlicensed, and undisclosed role advising Dr. Fletcher "as a friend only." *Lindke*, 601 U.S. at 198; R. 273-1 at 3, PageID 4783.

Moreover, having validly waived his right to counsel *twice*, Dr. Fletcher cannot complain that Deters rendered ineffective and unethical counsel. A defendant who waives the right to counsel "relinquishes . . . many of the traditional benefits associated with the right to counsel." *Faretta*, 422 U.S. at 835. These benefits include protections against ineffective or unethical assistance of counsel. *See Cuyler*, 446 U.S. at 344–45. But Dr. Fletcher waived those protections, entrusting instead an individual who disclosed that he had no license and had already received

widely-publicized professional discipline. *Faretta* warns a defendant against the perils of self-representation, but it does not immunize a defendant against its consequences. *See Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (explaining that the right to self-representation protects individual autonomy, even at the expense of an increased likelihood of an unfavorable outcome at trial).

Neither can Dr. Fletcher trace a due-process violation to the court's conduct. A court has "the power and responsibility to protect the integrity of [its] proceedings and to ensure that the [defendant] receives a fundamentally fair hearing." *Al-Saka*, 904 F.3d at 434. As a state actor, a trial judge has an obligation "to stop a compromised attorney from infecting the proceedings with unfairness." *Ibid.* But a court has no obligation to correct what it can neither observe nor suspect. *See Cuyler*, 446 U.S. at 347 (holding that a trial court has no duty to inquire into defense counsel's conflicts of interest unless "the trial court knows or reasonably should know that a particular conflict exists"); *Al-Saka*, 904 F.3d at 434 (explaining, in an immigration case, that a court would violate a non-English speaker's due-process rights if "the judge *knew* that the interpreter could not accurately translate the alien's testimony and never corrected the problem") (emphasis added).

Dr. Fletcher completely concealed Deters's involvement from the court and the government until after trial. Dr. Fletcher and Deters kept their association secret even when Deters surreptitiously listened to the June 6 hearing despite the court's instruction for attendees to identify themselves. Because Dr. Fletcher never gave the district judge any reason to suspect that an unlicensed attorney was influencing his pro se representation, he cannot demonstrate a due-process violation.

## III

For the foregoing reasons, we **AFFIRM** Dr. Fletcher's convictions.